THE STATE OF KANSAS *ex rel.* M. W. REYNOLDS *v.* R. A. BARKER, SEC'Y OF STATE, *et al.*, Respondents.

### *Application for a Writ of Mandamus.*

The law of March 8th, 1868, though providing for the printing of a book, differing in almost every particular, as to size, type and make-up, from the book provided for in the general law regulating public printing, yet it has the same object in view, viz: the printing of the general and special laws.

The legislature, evidently under a misapprehension of their power, intended to give a more desirable copy of the laws revised; but its power over the printing of the "laws" had been exhausted when the contract for such printing was let under the general law. They could

not avoid the contract then made by passing a new law, and *held* that the relator could get no contract for printing the laws under the new law.

The same principles, governing in the case of The State *ex rel.* Speer *v.* Barker, *ante,* govern in this.

The facts of this application are as follows :

The legislature, during the session of 1866–7, passed an act authorizing the appointment of commissioners for and regulating the preparation of a compilation of the statutes of Kansas, which work was to be and was prepared and submitted to and passed by the legislature of 1867–8. March 8th, 1868, an act was passed further regulating the said compilation, and providing the manner of and for letting the contract for printing and binding the said work, under the name of " General Statutes of Kansas." The relator was the successful bidder at such letting, complied with the law of March 8th, as to giving bonds, &c., and demanded of the secretary of state and of the compiling commissioners, respondents, the copy ; upon failure to get which, this application was made.

The principal objection to delivering the copy to relator grew out of the fact that John Speer held the contract under the general law regulating public printing for printing the "laws," which contract went into operation on the 4th Monday of December, 1867, continuing one year, and the respondent, in the case of The State *ex rel.* Speer *v.* Barker [*ante, p.* 379], had been ordered to deliver the copy to Speer.

*Thacher & Banks,* for relator.

*Williams & Hanback* and *G. H. Hoyt,* attorney general, for respondents.

*Thacher & Banks,* for relator, submitted :

A writ of mandamus will issue "to compel the performance of an act which the law specially enjoins as a duty." *Civ. Code,* § 580, *Comp. L.,* 225.

If the relator has a right to print the book under his contract, he is entitled to the copy. § 23, *act May* 15, '61, *Comp. L.,* 760 ; § 23, *act Mar.* 8, '68.

On the question of the validity of the law of 1868, and of the Reynolds contract, we submit:

1. The contract is regular, and conforms to the law.

2. The presumption is that the law is valid. That it is not, must clearly appear. (1 *Cow.,* 564 ; 26 *Wend.,* 599 ; 3 *Denio,* 381; 20 *Wend.,* 382 ; 3 *Seld.,* 109 ; 3 *Serg. & R.,* 63, 73 ; *Sedg. Stat. L.,* 126–7, 482 ; 6 *Cr.,* 128, 188.) Whether a law be a good or bad one, cannot be considered. 21 *Wend.,* 584 ; 3 *Seld.,* 109 ; 6 *Ind.,* 501; 3 *Const.,* 547, 568 ; *Sedg.,* 486.

The contract is not impaired, within the meaning of the federal constitution, unless the action of the state is on the contract. *Sedg.,* 640 ; 11 *Pet.,* 581, McLEAN, J.

The law of March 8th, 1868, does not purport to, nor does it directly, affect any existing contract. We are to seek, in a construction of the laws giving rise to the contracts, for any indirect effect (*Sedg.,* 640); that is, see whether the two laws conflict.

The contract contemplated in the general law of 1861 and that in the law of 1868, do not, in any particular, conflict as to affect each other. They provide for two separate mechanical jobs. No copy-right or other interest is transferred by either contract. The only "vested right" that could in either case be acquired, is to furnish materials, do the work specified in each, and draw pay therefor.

It was competent for the legislature to, and they did, in these two laws, provide for two distinct jobs—for printing two different books.

The law of '61, as amended, provides for an edition of 1,800 (*Comp. L.*, 675, §1); the law of '68, 5,000. The law of '61, for a book in royal octavo form (*Comp. L.*, 756, §7); the law of '68, one in super royal octavo (§15). The law of '61, in good small pica type for the body, printed like and with notes same as the laws of 1860 (*Comp. L.*, 756, §7); the law of '68 provides for the body in new small pica, solid, with notes of pearl or nonpareil. The intermediate size of type, agate, being the type of the notes of the laws of '60, is not inserted in the law of '68. By the general printing act, the laws are bound in paper (*L.* '65, *p.* 156); by the law of '68, in substantial law sheep. By the law of 1861, the book must contain "the general and local laws" (*Comp. L.*, 754, §2), a list of the members of the legislature and state officers (*id.*, 761, §24), and an index made by the secretary of state; while the book bid for by relator contains "head notes to chapters, marginal notes, annotations by the editors (§13), the federal and state constitutions, the organic act, Louisiana treaty, and such parts of the general laws as the editors shall select, an index prepared by the editors —the whole to be edited and superintended by the compiling commissioners."

The law of 1861 provides for "paper same as that of laws of '60, and same sized page" (*Comp. L.*, 756, §7); that of '68, for paper same as that of report of commissioners (§15), and pages and style of book same as statutes of Missouri of '65.

The two contracts differ as widely as the books. Under the law of '61, the printing is let in a separate

contract by the 1,000 ems (*Comp. L.*, 755, § 2), by bids
advertised for "four successive weeks, in four news-
papers in different sections of the state," and the pub-
lication is to commence yearly in the fourth week of
September (*id.*, 761, § 1); contract to continue "for the
term of one year from the fourth Monday in December,
next following such letting," which is to be to the low-
est responsible bidder (§ 2), who shall give bonds in
from $2,000 to $5,000 (§ 11), conditioned to perform
according to act of '61. Under the law of '68, bids
were advertised for, "immediately after the passage
of the act," for ten days, in three daily newspapers in
the state (§ 16), by the 1,000 pages (§ 18), let to the
lowest and best bidder (§ 17), who must accompany
his bid with a guaranty, with bond "for the execution
of the work and delivery thereof, bound, to the secre-
tary of state, at Topeka, within four months, under
penalty of $20,000." This law is of no more vitality
after this one edition is completed.

The contracts and the books differ in all respects.
They do not have the same object in view.

Whatever notions the court may have of the propriety
of the two contracts existing at the same time, can-
not enter into the decision. (*Sedgk.*, 677, 180, 187.)
We must be governed by the laws in seeking for the
object had in view in each. The object in view in the
law of 1861 is the printing yearly, as the regular state
printer, of one edition (*See L.* '65, *p.* 156) of the "local
laws" and the "general laws" (*Comp. L.*, 754, § 2),
without note addition, subtraction or comment. With
this contract no exclusive right is obtained by the suc-
cessful bidder to set up the laws. But the legislature
may provide for a variety of contracts, for printing the
laws in as many different styles, and they could not be

said to conflict. "Local laws" and "general laws," as used in the law of 1861, must be taken in the sense of book. "Laws" and "statutes" are words that have acquired a peculiar meaning. The former indicates the yearly publication of the session laws, while "statutes" generally indicates a revision or compilation of all the laws of a state. (*Vide Mo.*, *Ohio*, *N. Y.*) In many states session laws are printed yearly, while every ten years or so a revision is also published.

The object aimed at in the law of 1861, as we have contended, was to provide for printing a year book of the session laws. The object in the law of 1868 was to provide for the publication of a mere compilation. This is shown by the fact—*a.* That the law of 1868 does not purport to amend or affect the law of 1861, but recognizes its potential existence. (§ 23.) *b.* The law of 1868 provides for a special contract, for a special job of printing and binding, bid for as an entirety. *c.* That the object of the law of 1868 was to provide for publishing a compilation, and not the local and general laws, as such, is conclusive from the act authorizing the compilation. (*L.* '67, *p.* 150.) That law gives power to the commissioners to "revise" and "codify" the civil and criminal codes, and all laws of a general nature, of the state (§ 1), suggest repeals and new acts, to make a complete compilation of the laws of the state, with marginal notes, &c. (§ 5.) *d.* A compilation, defined, "a collection from different authors." (*Worcester*, *Webster.*) The book provided for fulfills this definition. (§ 13.) *e.* The work, after the laws it may contain leave the hands of the legislature, is to be edited by the commissioners. They are given an editor's discretion as to arrangement, and have the power to strike out words, clauses

and sections from the acts of the legislature, change the headings, divide the subject matter into chapters, make head notes to the chapters, make side notes to each section, and add original matter by way of marginal notes of supreme court decisions, and to make an index to the whole. Every characteristic of a pure compilation is here. The law of 1861 does not include it.

An appropriation was provided for each ; for the printing under the general act, of $18,000 (*see general appropriation bill,* '68), and a special appropriation for this special compilation. A case must be presented that brings this law of 1868 in conflict with vested rights, beyond any doubt, and beyond any considerations of what the legislature ought to have done, or whether the law be a good or bad one. The legislature is not bound to assign a cause for the passage of any law. *Sedgk.,* 636, *note ;* 12 *Miss.,* 156.

There is a clear, plain and consistent construction, by which both laws and contracts may stand without conflict ; and, if so, this court is bound to so find.

*Williams & Hanback,* submitted, for respondents :

The law providing for the publication of the "general statutes" was intended, by its framers, to cover the same printing which this court has determined John Speer was entitled to, under his contract of 1867. *The State ex rel. Speer* v. *Barker et al., ante.*

All the legislation of this state shows that where laws are ordered to be published in book form, provision" is always made for their distribution. If the legislature had contemplated *two* publications it would have made some provision for the disposal of the 1,800

copies of the "laws," as well as of the 5,000 copies of the "general statutes." The legislature of 1868 contemplated the printing of one set of laws, and that the "general statutes," and, therefore, provided for disposing of but one set.

This intention is further evinced by the fact that no appropriation was made for publishing any set but the "general statutes." The item of $18,000 in the general appropriation bill, was for deficiency of 1867, and general printing, as of proclamations, &c.

This court has decided that that portion of the law of '68 which provides for letting the contract for printing the "general statutes," impairs the obligation of the contract let to Speer in 1867; relator has, therefore, no valid contract for printing, whatever.

A final, practical question is suggested: What effect the law of 1868, in modifying the style of the publication of the laws, has on Speer's contract?

Speer's contract is not for printing any particular number or style; but generally, to print all the general and local laws ordered to be printed before the 4th Monday of December, 1868. The provisions of the act of 1868, modifying the previous law, as to the number of volumes, &c., enters into and becomes a part of the contract.

*Attorney General, Hoyt,* also filed a brief, for respondents, which has been mislaid.

*By the Court,* KINGMAN, C. J.

The relator in this case was awarded the contract for the printing and binding of the general statutes, under the law of the last session, approved March 8th, 1868,

and asks the court to award him a writ of mandamus, compelling the secretary, and the commissioners appointed to codify the laws, to furnish him the copy thereof. Such principles as were deemed material to discuss, and which must control this case, were presented in the case of The State *ex rel.* John Speer *v.* R. A. Barker, *ante,* decided at this term of the court. It is, however, contended for the relator in this case, that the two contracts may well be in force; that there is sufficient evidence in the law of last winter to justify such a conclusion, and that in such a case the court is bound to give such a construction as will give effect to that law, so far as the relator's claim is concerned. We concede, as a sound rule of construction, that the courts will hold that the presumption is that every statute, the object and provisions of which are among the acknowledged powers of legislation, is valid and constitutional, and such presumption cannot be overcome unless the contrary clearly appears; and, therefore, unless it clearly appears that the legislature transcended its powers by directing a new contract to be made, this court will be constrained to hold the relator's contract valid and binding, and his right to the writ prayed for undoubted.

We do not propose again to examine the question decided in the case of Speer, relator, *v.* Barker.

It was there held that the legislature could not avoid its contract, by a new law; that it had exhausted its power over the printing of the laws when it had let them by contract, and the contract still held good. But here it is insisted that the printing claimed by the relator is of a different character. Other matters, such as the constitution, are to be printed. The laws are to be printed with head notes and references to

decisions, upon a different quality of paper, of a larger size, and with different type, and are to be differently bound, and a larger number are to be printed. In short, the differences are so many, and so minute, that it would seem that the law was studiously drafted for the argument, rather than the argument made for the law. There is hardly a conceivable agreement in the specifications of the two laws, and yet they have one and the same object, viz: The printing of the general and special laws. If, as we believe, the legislature, mistaking its power over the matter, desired to provide for the printing of the new revision in a better and more desirable manner than was stipulated for in the previous laws on that subject, their purpose would be readily understood and approved. But, if they, with studious skill and laborious minuteness of detail, sought to accomplish this purpose by multiplying variances, so that the state should be burthened with the cost of paying for the printing of two sets of laws, then the measure of approval will be very much diminished. And yet this unworthy motive is the one, in effect, that the counsel places as the influential one, with those who made the law. It is not the language of his argument, but it is its logic. We attribute no such motive, but think they acted in good faith—not to make a contract, or to avoid one, but, under a misapprehension of the facts, or their power in the premises, thought only to give a more perfect and desirable copy of the revision they adopted to the people of the state. Still, it was their main controlling idea to have the laws printed and circulated. This had already been provided for. The state was bound by its contract. If it could avoid its contract by a multiplicity of changes in the details, then a contract with the

state is of no value, for it is subject entirely to the caprice of the legislature. If it would provide for the printing of two sets of laws, it might for a dozen; and the constitutional limitations, and the objects sought by them, would be valueless. We think, so far as the law of last session provided for the printing of the laws is concerned, the legislature exceeded their power; and it follows as a necessary and inevitable consequence that the relator could get no contract under it.

The motion for a mandamus must, therefore, be refused.

All the justices concurring.