Argued on demurrer May 15, overruled May 15, opinion filed June 6, 1917.

Argued on the merits May 17, writ issued May 22, opinion filed June 6, 1917.

## STATE ex Rel. *v.* STANNARD.

(165 Pac. 566; 165 Pac. 571.)

### ON DEMURRER.

**Mandamus—Capacity of Governor to Sue—Constitution.**

1. Under Article V, Section 10, of the Constitution, declaring that the Governor shall take care that the laws shall be faithfully executed, the Governor of the state has the right to bring *mandamus* to compel the county clerk of a county, the sheriff, the county judge, and others to perform the duties imposed upon them by law in regard to the calling and holding of elections, and, in particular, in respect to a special election.

**Mandamus—Prematurity of Proceeding—Compelling Action by Election Officials.**

2. The Governor could bring *mandamus* to compel the county clerk of a county, the sheriff, and other officers to perform the duties imposed upon them by law in regard to the calling and holding of election before the time had arrived on which the posting of notices and other prerequisites to the election are required to be done, the officials having absolutely refused to take steps toward holding the election, and declared their intention not to do so, since, though ordinarily *mandamus* will not lie to compel the performance of an act until the time for doing the act has arrived, where a refusal to perform has occurred, and where it seems probable that the act will not be performed within the time required, *mandamus* will lie, and a proceeding brought upon the strength of the refusal is not premature.

### ON THE MERITS.

**Counties—Limitation of Expenditures—Removal of Restrictions—Special Elections.**

3. Under Laws of 1917, page 894, directing that a special election be held in June, in all voting precincts of the state, for the purpose of voting on proposed laws and constitutional amendments, authorities of Curry County were not justified in refusing to take steps toward holding the election on the ground the county budget made no provision for the election, for the reason that the next regular election will occur in 1918, although Laws 1913, page 458, provides that no greater expenditure of public moneys shall be made for any specific purpose than the amount estimated in the budget plus 10 per cent, the act of 1917 removing the restrictions by an implied command that the several counties pay the expense of such election.

**Constitutional Law—Public Policy—Adoption by Voters.**

4. Questions of public policy and questions of what it is best to insert in the Constitution must be regarded as having been conclusively settled when the legal voters adopted the amendment.

**Constitutional Law—Judicial Functions—Construction.**

5. The oath of the judiciary is to construe the Constitution as it is and not as it might have been.

**Counties—Exceeding Debt Limit—"Involuntary Indebtedness"—Elections.**

6. Under Article XI, Section 11, of the Constitution, (see Laws 1917, p. 12), providing that the prohibition against the creation of debts by counties prescribed by Section 10 of this Constitution shall apply and extend to debts hereafter created in the performance of any duties or obligations imposed upon counties by the Constitution or laws of the state, etc., any debt contracted by Curry County in holding the special election provided for by Laws 1917, page 894, would be an "involuntary indebtedness," incurred in the performance of a duty and obligation imposed by a law of the state, and therefore prohibited, if exceeding the $5,000 limit fixed by said Section 10.

**Counties—Debt Limit—Presumptions.**

7. After a levy is made, the payment of taxes is regarded as a certainty, and, for the purpose of determining whether an expenditure will exceed the debt limits of a county, it will be assumed that the tax has been collected.

**Counties—Elections—Expenditure of Funds—Preferences.**

8. Although, if its plans were carried out, it would be impossible for county to hold the special election provided for by Laws 1917, page 894, without exceeding the constitutional debt limit, it must set aside a sufficient sum to pay for the election, and out of the balance pay for its plans, such obligation having preference.

[As to *mandamus* in matters relating to elections, see note in 98 Am. St. Rep. 886.]

Original proceeding in Supreme Court in *mandamus*.

Proceeding in *mandamus* by the State of Oregon, upon the relation of James Withycombe, Governor, against J. R. Stannard, county clerk of Curry County, Oregon; William Tollman, sheriff of Curry County, Oregon; W. A. Wood, county judge of Curry County, Oregon, and G. J. Heiberger and E. B. Sypher, county commissioners, the three last-named parties constituting the County Court of Curry County, Oregon, to require said defendants to perform their official duties in regard to calling and holding the special election in Curry County on June 4, 1917. To the writ, defendants file a demurrer. Demurrer overruled.

*Mr. Samuel M. Endicott,* for the demurrer.

*Mr. George M. Brown,* Attorney General, and *Mr. Isaac H. Van Winkle,* Assistant Attorney General, *contra.*

In Banc.    Opinion by MR. CHIEF JUSTICE MCBRIDE.

This is a proceeding in *mandamus* to compel the defendants to perform the duties imposed upon them by law in regard to the calling and holding of elections, and in particular in respect to the special election to be held throughout the State of Oregon on June 4, 1917. It is alleged that the defendants, who are the county commissioners, county judge, clerk, and the sheriff of Curry County, refuse to take steps required by law or to give the notices necessary in respect to such special election, and declare that they will not take the steps required by law to hold such election.

To this writ a demurrer is filed stating two grounds: (1) That the relator has not the legal capacity to sue; and (2) that the writ does not state facts sufficient to constitute a cause of action.    As to the first ground it may be said, in brief, that by Article V, Section 10, of the Constitution it is declared that the Governor shall take care that the laws shall be faithfully executed.

1. Where a public official charged with a duty to the whole state, as in this case, refuses to execute the law and to perform his duty in that regard we think the Governor is acting only in obedience to this requirement of the Constitution in appealing to the court to compel that official to perform such legal duty.

2. It is also alleged that this proceeding is premature, and that *mandamus* will not lie until the time has arrived upon which the posting of notices and other prerequisites to an election are required to be done.    Upon this theory the relator would be compelled to wait until

the last minute of the last hour within which the act might be done, and after that time had expired before he could bring a proceeding to compel the act to be performed. A proceeding to compel performance of an act after the time for such performance has expired would be futile and would result in a condition wherein there would be no adequate remedy against a grave public wrong. The law does not contemplate any such absurdity; and accordingly it has been held that while ordinarily *mandamus* will not lie to compel the performance of an act until the time for doing the act has arrived, yet where a refusal to perform the act has occurred and where it seems probable that the act will not be performed within the time required *mandamus* will lie, and a proceeding brought upon the strength of such refusal is not premature: *State ex rel.* v. *Chicago etc. R. Co.,* 85 Kan. 649 (118 Pac. 872); *Attorney General* v. *City of Boston,* 123 Mass. 460; *People ex rel.* v. *Smith,* 152 App. Div. 514 (137 N. Y. Supp. 387). The latter case was one of *mandamus* to compel the board of elections to file certain certificates of nomination, wherein the court says:

"The duty devolved upon the board of elections is to file certificates of nomination which are in conformity to the provisions of the last valid statute relating thereto, if any such exists. No express demand to file any particular certificate has been made upon defendants. There has been no express refusal to do so. Granting that defendants' duty is a public one, and that omission to perform such duty is equivalent to a refusal to perform * * it may be urged that as yet the defendants have not omitted to perform, for the time fixed within which performance may be had has not yet expired. * * But although evidence is lacking of an express refusal to perform a particular act, we think that it may justly be inferred that defendants will refuse to file any certificate except one which shall

comply with the requirements of the statute above referred to. * * Where delay in reaching such determination will result in depriving one of an efficient remedy if the determination is erroneous, either the presumption above referred to should prevail, or the person charged with the performance of the duty should seasonably announce his determination respecting his future action in terms admitting of no mistake or misunderstanding.''          .

The case above cited is not so strong as the case at bar because here the defendants absolutely refused to take steps toward holding the election and declared their intention not to do so. The statutes under which these decisions were rendered are similar to our own and the opinions seem to be based upon sound common sense.

The following cases are cited as holding a contrary view, and while some of them upon a cursory examination would appear to be in point yet when thoroughly analyzed none of them are applied to circumstances exactly identical to those in the case at bar.

The first case is *County Commissioners of Lake County* v. *State,* 24 Fla. 263 (4 South. 795). In this case there was no allegation in the complaint that the commissioners had refused to call the election. It was only alleged that they did not intend to and would not perform that duty. The court held that this was not a sufficient allegation to call into effect the power of *mandamus.* The other Florida cases are to the same effect.

*Lee* v. *Taylor,* 107 Ga. 362 (33 S. E. 408), merely holds that *mandamus* will not lie to compel a tax collector to pay over tax moneys to an outgoing treasurer so that such treasurer can get a commission. It seems to have no relation whatever to the case at bar.

In *Gormley* v. *Day,* 114 Ill. 185 (28 N. E. 693), there does not appear to have been any refusal on the part of the clerk to post the copies of an ordinance. The court also held on the merits that the petitioner was not entitled to the relief sought. The case is not in point.

The case of *People* v. *Quinn,* 143 Ill. App. 123, was a *mandamus* proceeding by the city treasurer to compel the city comptroller to pay over to the relator moneys received by such comptroller from day to day as they were collected. It was held that *mandamus* does not lie to direct the performance of an act until a default, that the defendant was entitled to a reasonable time within which to pay over the money he held, and that if he held it beyond such time *mandamus* would lie. In that case it is apparent that no serious mischief would have resulted had the issuance of a writ been delayed until after refusal to comply, while in the case at bar it is plain that delay in the issuance of the writ until the time prescribed by law for the County Court of Curry County to perform its duty would render any proceeding entirely futile and might result in defeating the will of the people of the whole state as to important measures to be submitted at the ensuing special election.

The case of *State ex rel. Cook* v. *Houser,* 122 Wis. 534 (100 N. W. 964), grew out of a political controversy as to whether the LaFollette or anti-LaFollette delegates should be placed on the ballot as the genuine Republican delegates. The court held that as the time for placing the names of the candidates upon the official ballot had not arrived the proceeding was premature. Nevertheless they went into the question upon its merits in an opinion which owing to its learned length it is impossible to epitomize here. In

said case, as in a case in Wisconsin hereafter to be noted, we find the court practically conceding that there may be ''special circumstances'' in which courts will depart from the general rule that *mandamus* will not lie to compel the performance of an act until the duty to perform it is due.

*Ex parte Cutting,* 94 U. S. 14 (24 L. Ed. 49), was *mandamus* to compel the court to allow an appeal. *Held,* that the petition must show that the petitioner has a clear right to an appeal which has been refused him, and that it was not shown in that particular case. The case is not in point.

*State ex rel.* v. *Hunter,* 111 Wis. 582 (87 N. W. 485), was a *mandamus* proceeding to compel a city treasurer to set aside certain moneys as school funds, wherein it was held that the funds had not yet come into his hands and might never come there, and that the application was premature. In the course of the opinion it is said that *mandamus* will not lie to compel the performance of an act not yet due by a public officer because of a mere threat by him that he will not perform it.

The court admits that this is contrary to the ruling in *Attorney General* v. *City of Boston,* 123 Mass. 460, and adds very significantly:

''Extreme cases may, perhaps, arise demanding the use of *mandamus* to control the performance of prospective duties, but this is certainly not such a case.''

It appears to us that the case at bar is just such an ''extreme case.'' Here there rests upon the County Court of Curry County an important duty, which by their general demurrer they admit they have been requested to perform and refuse to perform and will not perform; and this, too, in a case where such refusal might defeat the will of the whole people of the state

in respect to important measures which will come up for their vote at the ensuing election. They say, in effect, that they intend to paralyze the arm of the state and defeat the will of the voters. If this is not an extreme case, it would be difficult to find such.

The case of *Northwestern Warehouse Co.* v. *Oregon R. & N. Co.,* 32 Wash. 218 (73 Pac. 388), was *mandamus* to compel defendants to build a sidetrack for plaintiff's warehouse. This is a somewhat complicated case, in which it is announced that *mandamus* will not lie in anticipation of a supposed omission of duty, but it must appear that there has been an actual default in the performance of a clear legal duty actually due. The court held that the law did not require the defendants to construct the track, and the case went off on entirely different grounds from anything involved in the case at bar.

*Sights* v. *Yarnalls,* 12 Gratt. (Va.) 292, was *mandamus* to compel the issuance of a saloon license, in which it was held that *mandamus* would not lie to compel the council to grant a license until the time had arrived at which the application for such license could come up for consideration. This was evidently a case where a delay would not defeat plaintiff's right.

*Spiritual Atheneum Soc.* v. *Selectmen, etc.,* 58 Vt. 192 (2 Atl. 747), is a case fully covered by the syllabus, which is as follows:

"A petition for a writ of *mandamus* will not be granted to compel public officers to do an act already beyond their control, nor against their successors in office not yet elected to compel them to perform an act in the future."

It is evident this case is not in point by a thousand miles.

*Thaxton* v. *Terrell,* 99 Tex. 562 (91 S. W. 559). This was *mandamus* to compel the land commissioner to receive an application for state land. It appears that defendant accepted the application after the writ issued subject to certain conditions as to the minerals on the same. It was held that this acceptance avoided the necessity of issuing the writ; that plaintiff had a remedy in equity to compel the issuance of patents without the restrictions imposed by the land commissioner. For that reason the case is not in point.

*State ex rel.* v. *Bates,* 38 S. C. 326 (17 S. E. 28), was *mandamus* to compel the state treasurer to transfer certain stocks formerly owned by a deceased person to the relator, who was his legatee, and the court in that case decided that such transfer should not be made until the expiration of one year prescribed by law for creditors to present their claims, and that for this reason the application was premature. It is plain that the transfer might never be made if the claims should consume the stock. The case is not in point.

*City of Zanesville* v. *Richards,* 5 Ohio St. 589, was *mandamus* to require the auditor to enter upon the tax list for the years 1855 and 1856 certain taxes levied for city purposes for these years. The return showed that the time had passed within which the auditor could place levies upon the tax list for 1855, said list having passed out of his hands, and that the list for 1856 had not yet come into his possession. The case does not disclose that he refused to place the taxes for 1856 on the list when they should come into his possession. The case is easily distinguishable from the one at bar for the reasons already given.

*State ex rel.* v. *School District,* 8 Neb. 93, is a similar case, in which there is no allegation of a demand or refusal to comply.

In *State* v. *Associated Press,* 159 Mo. 410 (60 S. W. 91, 81 Am. St. Rep. 368, 51 L. R. A. 151), demand and refusal had not occurred. The court lay special stress upon this fact.

*Board of Commissioners, etc.* v. *Allegany County Commissioners, etc.,* 20 Md. 449, was *mandamus* to compel the county commissioners to levy a tax, and it was therein held that there was no presumption that because the commissioners had refused to levy the same kind of a tax in 1861 they would refuse to levy it in 1862, and that the court would not act on such presumption.

*Sterling* v. *McMaster,* 82 Md. 164 (33 Atl. 461). This was *mandamus* to compel McMaster, treasurer and collector, to place in the hands of the sheriff bills for the collection of unpaid taxes. The case is somewhat similar in some respects to the case at bar, but it has this distinguishing feature: In that case there was ample time left after the period fixed by law for the treasurer to turn over the bills in which *mandamus* might be brought and the alleged duty enforced. A failure to issue the writ therefor would not work any serious injury, and under these circumstances the court held that the writ was premature. These are practically all the cases cited outside of our own state, and in many of them it is laid down as a general rule that *mandamus* will not issue to compel the performance of a duty before the time for such performance has arrived. This rule in some form or other has been ''parrotted'' down from court to court and from judge to judge without any particular reason being given for it or any attempt to distin-

guish between those cases where a denial of the writ
will work no serious or irreparable injury and those
"extreme cases," to use the words of the Michigan
supreme court, where such denial would work great
injustice or public injury or prevent the exercise of
the constitutional right of all citizens of the state to
a voice in the elections. The rule as a general one
is good, but as heretofore shown there are well-
defined exceptions to it, and this is one of them. The
courts will not chop technicalities when their aid is
asked to compel the performance by a public officer
of a duty which he owes to the citizenry of the whole
state, but where no other remedy presents itself will
exercise their constitutional authority to compel by
*mandamus* the performance of such duty.

The demurrer is overruled.


Mr. Justice McCamant took no part in the consideration of this case.


Mr. Justice Burnett delivered the following dissenting opinion:

On petition of the relator an alternative writ of
*mandamus* issued out of this court reciting the official
character of the Governor of the state and of the attorney general and the fact that the defendants are
officers of Curry County. It is also set forth that by
chapter 422 of the Laws of 1917, now in effect, a special
election is required to be held throughout the state
June 4, 1917, at which sundry legislative enactments
and proposed amendments to the Constitution shall be
submitted to the people for their approval or rejection.
The essential charging part of the writ reads thus:

"That notwithstanding the provisions of said chapter 422, Laws of 1917, and the requirements of the

other laws of the state of Oregon, the defendants herein and each of them have refused and do now refuse to perform the duties imposed upon them by law with respect to giving notice of and holding elections with reference to the election provided for in said chapter 422, within Curry County, or to do or perform any other duty or thing with respect to preparing for, giving notice of, or holding any election within said Curry County, Oregon, on the fourth day of June, 1917, or to canvass or abstract and record the returns of said or any election to be held on said date, or to transmit the certificate thereof to the secretary of state, or to do any other act or thing in connection therewith, and threaten and declare that they will not do so, and, unless commanded so to do by order of this honorable court will not perform such duties aforesaid. * * "

A demurrer to the writ having been overruled *pro forma,* the defendants have answered to the effect that Curry County has no funds available for the expense of the election it not having been included in the annual budget; further, that the county is already indebted in at least the sum of $5,000 and that the additional expenditure involved will be in excess of the constitutional limit; and lastly, that in order to meet the cost of the election the County Court will be compelled to levy taxes in excess of the 6% limit prescribed by the constitutional amendment adopted at the November election held in 1916.

The initial act required in the matters involved is for the county clerk to issue notice of election not less than ten days prior to the day appointed for holding the same. This action is not indispensably necessary of performance in any event until at least May 24, 1917, a date yet in the future. The quoted excerpt from the writ, upon which the relator bases his claim, contains only conclusions of law. It is in effect noth-

ing more than the expression of his prediction that the defendants will not meet his views of the law in their action in the premises. Mr. Chief Justice MOORE, writing in *State ex rel.* v. *Williams,* 45 Or. 314, 330 (77 Pac. 965, 67 L. R. A. 166), said:

"The writs having stated that the municipal judge neglected to issue bench warrants 'as required by law,' the phrase quoted is only a legal conclusion, and not the averment of a material fact, stated as the foundation of an enforceable right."

This doctrine is well supported by many authorities both before and since then holding that such statements do not present any issue for consideration.

Moreover, paraphrasing the statement of the writ, the defendants have a right to "refuse and to now refuse to perform the duties imposed upon them by law" for the very good reason that the time for their performance has not yet arrived.

"A relator is not entitled to the writ unless he can show a legal duty then due at the hands of the respondent; and until the time arrives when the duty should be performed, no threats or predetermination not to perform it can take the place of such default. The law does not contemplate such a degree of diligence as the performance of a duty not yet due. The general rule is that the writ will not be granted in anticipation of a supposed omission of duty, however strong the presumption may be that the person sought to be coerced by the writ will refuse performance at the proper time. An important reason for refusing the writ in such cases is, that until the duty is due, no practical question can be presented to the court, but simply a supposed case." 2 Spelling, Extraordinary Relief, § 1385. Again, we find in section 12 of High on Extraordinary Legal Remedies (3 ed.), the following:

"*Mandamus* is never granted in anticipation of a supposed omission of duty, however strong the pre-

sumption may be that the persons whom it is sought
to coerce by the writ will refuse to perform their
duty when the proper time arrives. It is therefore
incumbent upon the relator to show an actual omis-
sion on the part of the respondent to perform the re-
quired act; and since there can be no such omission
before the time has arrived for the performance of
the duty, the writ will not issue before that time.
In other words, the relator must show that the re-
spondent is actually in default in the performance of
a legal duty then due at his hands, and no threats
or predetermination can take the place of such default
before the time arrives when the duty should be per-
formed; nor does the law contemplate such a degree
of diligence as the performance of a duty not yet due.''

This court itself has spoken on the same subject
in *State* v. *Bryan,* 26 Or. 502, 507 (38 Pac. 618), where
Mr. Justice WOLVERTON writing, uses this language:

''It is a just presumption that all public officers
will faithfully discharge the functions of their re-
spective offices, and observe all the duties enjoined
upon them by law, and it would be a work of super-
erogation for the courts by *mandamus* or other process
to command them to perform their duties *in futuro*
as they are by law directed. Courts will not assume
or exercise supervisory control over public officers
and functionaries, whether state, county, or municipal,
nor will they attempt to control their acts, or com-
mand them to act, except in cases where there has
been a plain violation of official and public duty which
the law specially enjoins upon them, and it is made
to appear that some private individual or the public
has a legal right or title to the due performance of such
duty, and that there exists no other plain, speedy, or
adequate remedy in the ordinary course of law.''

The following precedents are to the same effect:
*U. S.* v. *Bowen,* 6 D. C. 196; *County Commrs. of Lake
Co.* v. *State,* 24 Fla. 263 (4 South. 795); *Ex parte
Ivey,* 26 Fla. 537 (8 South. 427); *Lee* v. *Taylor,* 107

Ga. 362 (33 S. E. 408); *Gormley* v. *Day,* 114 Ill. 185 (28 N. E. 693); *Chicago etc. R. R. Co.* v. *Olmstead,* 46 Iowa, 316; *State* v. *Carney,* 3 Kan. 88; *Sterling* v. *McMaster,* 82 Md. 164 (33 Atl. 461); *Board of Commrs. etc.* v. *Alleghaney Co. Commrs.,* 20 Md. 449; *State* v. *Associated Press,* 159 Mo. 410 (60 S. W. 91, 81 Am. St. Rep. 368, 51 L. R. A. 151); *State* v. *School Dist.,* 8 Neb. 92; *Hardin* v. *Guthrie,* 26 Nev. 246 (66 Pac. 744); *State* v. *Noyes,* 25 Nev. 31 (56 Pac. 946); *Zanesville* v. *Richards,* 5 Ohio St. 589; *State* v. *Bates,* 38 S. C. 326 (17 S. E. 28); *Thaxton* v. *Terrell,* 99 Tex. 562 (91 S. W. 559); *Spiritual Atheneum Soc.* v. *Selectmen, etc.,* 58 Vt. 192 (2 Atl. 747); *Sights* v. *Yarnalls,* 12 Gratt. (Va.) 292; *Northwestern Warehouse Co.* v. *Oregon R. & N. Co.,* 32 Wash. 218 (73 Pac. 388); *State* v. *Hunter,* 111 Wis. 582 (87 N. W. 485); *Ex parte Cutting,* 94 U. S. 14 (24 L. Ed. 49); *State* v. *Houser,* 122 Wis. 534 (100 N. W. 964); *People* v. *Quinn,* 143 Ill. App. 123; *Missouri etc. R. Co.* v. *Thompson,* 55 Tex. Civ. 12 (118 S. W. 618); *State* v. *Adcock,* 225 Mo. 335 (124 S. W. 1100); *Pierce* v. *Executive Council,* 165 Iowa, 465 (146 N. W. 85); *Scott* v. *Singleton,* 171 Ky. 117, (188 S. W. 302).

A leading case sometimes cited in opposition to this doctrine is that of *Attorney General* v. *City of Boston,* 123 Mass. 460, where the city council, authorized by statute to maintain a ferry at rates to be prescribed, ordered that it be free of ferriage after a certain future day, and the court, on application made before that time arrived, compelled the continued collection of toll by a writ of *mandamus.* Rightly considered this case is not variant in principle from those already cited, for the duty to collect toll was imperative at and before the issuance of the writ and it was what the court sought to enforce by its precept.

Besides the statute of the state of Massachusetts governing the matter gives jurisdiction to its courts far more extensive than ours on the subject of *mandamus*. The law of that state, as quoted in the opinion is this:

"The court shall have general superintendence of all courts of inferior jurisdiction to correct and prevent errors and abuses therein, where no other remedy is expressly provided, and may issue writs of error, *certiorari, mandamus,* prohibition, *quo warranto,* and all other writs and processes to courts of inferior jurisdiction, corporations and individuals, necessary to the furtherance of justice and the regular execution of the laws": Gen. Stats., c. 112, § 3.

The procedure there contemplates that *mandamus* may be used as a preventive remedy. This case has been cited many times as authority for allowing *mandamus* at the suit of some private person or of the attorney general to enforce a general public duty, but rarely, if ever, in support of the proposition that the writ will lie to enforce a duty not due when it was issued. In *State ex rel.* v. *Chicago B. & Q. R. R. Co.,* 85 Kan. 649 (118 Pac. 872), this procedure was employed to compel two railroads to install connections as required by an order of the railroad commission directing the work to be done within ninety days. The precept was issued three days after the order was made. The defendants defended on the merits pointing out, among other things, that it would be an unreasonable burden, entailing more expense than the revenue derived therefrom would liquidate. By some means or other the decision was delayed until after the expiration of the ninety days. Under those circumstances the court made the rule absolute, but

the same judge who penned the majority opinion dissented from the doctrine thereof on this point, saying:

"The duty and the time were coextensive. It was held in *State* v. *Carney,* 3 Kan. 88, that 'no previous threat or predetermination not to perform a legal duty can amount to a fault or omission, even though the showing be sufficient to convince the court that the respondents will omit to perform their duty.' This was followed in *State ex rel. Reynolds* v. *Barker,* 4 Kan. 435, in *Dobbs* v. *Stauffer,* 24 Kan. 127, and quoted with approval in *Rosenthal* v. *State Board of Canvassers,* 50 Kan. 129 (32 Pac. 129, 19 L. R. A. 157), and is in accord with the mandatory requirement of the statute. A present omission to do a future duty is a legal impossibility. The first time when it could be definitely known that the order had been disobeyed was nearly ninety days in the future, and I think an action before that time must have been premature."

In *Nevada Tax Commission* v. *Campbell,* 36 Nev. 319 (135 Pac. 609), the court gave a moot opinion on the duty of county officers to furnish tax rolls by a certain future time, but dismissed the proceeding with leave to apply again if the plaintiff should be so advised. It was said explicitly, though, that the writ would not be granted in anticipation of a refusal to perform the duty when the time for it should come. *State* v. *Metcalf,* 18 S. D. 393 (100 N. W. 923, 67 L. R. A. 331), was a case where the defendant officer was required by alternative *mandamus* to place the names of certain candidates on the official ballot. Without citing authority in support of its opinion the court said:

"Having made his demand, concerning which no doubt exists in this case, if the auditor did not express a willingness to comply therewith, it was proper to institute this proceeding, when, if defendant intended to comply with the demand, he might have disclosed such intention and have avoided any judgment for disbursements. But, having answered and contested the rela-

tor's right, he cannot be heard to say that he would or might have complied with the relator's demand."

A similar case, *People* v. *Smith,* 152 App. Div. 514 (137 N. Y. Supp. 387), cited in support of the instant writ, was modified on appeal in 206 N. Y. 231, 241 (99 N. E. 568), the court saying that it should not be considered as a precedent and that it should be limited to the very case itself. Later, in *People* v. *Britt,* 206 N. Y. 246, 249 (99 N. E. 573), the case was further limited, and speaking of the situation the court says: "The remedy for this incongruous result is with the legislature." These few cases are opposed to the great weight of authority and are sporadic instances of where courts have used their power in meddling with mere political questions.

It is required by our statute that the writ shall "state concisely the facts, according to the petition, showing the obligation of the defendant to perform the act, and his omission to perform it": Section 616, L. O. L. There can be no present omission to perform an act in the future. The writ is not to be confounded with injunction. Neither can it be made to perform the office of a bill of *quia timet.* We are not required to balance the relator's fears for the future against the presumption that the defendant officers will regularly perform their duties at the proper time. *Mandamus* ought to be used sparingly and only in clear cases, and this court ought not hastily to use its original jurisdiction to clarify a mere political emergency. No refusal to perform any official act, presently required, or past due, is imputed to any of the defendants, and if we regard the authority of *State ex rel. Booth* v. *Bryan,* already decided by this court, as well as the great weight of reason and precedent, the writ should be dismissed.

Peremptory writ issued May 17, 1917.

ON THE MERITS.

(165 Pac. 571.)

In Banc.    Statement by MR. JUSTICE HARRIS.

The twenty-ninth legislative assembly passed two proposed laws and at the same time, under the authority of Article IV, Section 1 of the state Constitution, referred them to the people for approval or rejection. The legislature also proposed five amendments to the state Constitution, and, pursuant to Article XVII, Section 1 of the organic act, these proposed amendments were ordered submitted to the people for their approval or disapproval. Chapter 422, Laws 1917, directs that a special election be held on June 4, 1917, in all the voting precincts of the state, and that the two proposed laws and the five proposed amendments shall be submitted to the legal voters for their approval or rejection at such special election.

The constituted authorities of Curry County announced that they would not obey the mandate of the legislature, and that they would not take any steps towards holding an election in Curry County. Upon the petition of James Withycombe, as Governor of Oregon, an alternative writ of *mandamus* was issued out of this court commanding the clerk, sheriff, county judge and commissioners of Curry County to perform all the duties imposed upon them by the laws regulating elections, or to show cause for any failure on their part.

The defendants demurred to the alternative writ, but the demurrer was overruled for reasons expressed in an opinion by Mr. Chief Justice McBRIDE. The county officials then answered by admitting that they

"have refused and do now refuse to do the things or perform the acts specified and set forth in the general election laws of Oregon to be done and performed by the respective county officers with respect to giving notice of and holding elections with reference to the election provided in said Chapter 422, within Curry County, or to do or perform any other act or thing with respect to preparing for, giving notice of, or holding any election within said Curry County, Oregon, on the 4th day of June, 1917."

The answer contains three further and separate defenses; and for the purpose of supporting these separate defenses the defendants relate the facts concerning the budget and the tax levy for 1917, the present indebtedness, and the probable expense of holding an election. The petitioner demurred to the answer. After hearing the arguments of counsel, we rendered an oral decision sustaining the demurrer and directing the issuance of a peremptory writ of *mandamus* ordering the defendants to hold the election; and this written opinion is prepared for the purpose of complying with a requirement of the Constitution. The parties have supplemented the writ and answer by a written stipulation giving detailed information concerning the items in the budget, the levy for 1917, and the character of the outstanding indebtedness. The answer expressly admits all the facts averred in the writ; the demurrer to the answer admits the facts alleged in that pleading; by the written stipulation, the parties added to the facts related in the writ and answer; and therefore the controversy was presented upon an undisputed statement of facts.

In November, 1916, an itemized estimate of the expenses proposed to be incurred during the year 1917 was made in full compliance with Chapter 234, Laws 1913, commonly known as the budget law. The budget

contains estimates for the salaries to be paid to the several county officers. The estimated cost of the County Court is $1,300, of the. Circuit Court $1,500, of the Justice Court $700, of books, stationery, postage, telephone, express and freight for all offices $1,500, of water, fuel, lights, repairs and furniture for all offices and of new vaults for treasurer's office $800, of board of prisoners $400, of medical attendance, clothing and board for the poor, $700, of auditing county books $175, of bounties on wild animals $1,000, of widows' pensions $400, of advertising and printing $700, of interest on warrant indebtedness $4,000, and of insane $100. The budget also includes estimates for bridges, roads and schools. However, no provision was made for election expenses for the reason that the next regular election does not occur until 1918. According to the written stipulation a tax levy was made on December 29, 1916, as follows: "For state tax 2.3 mills; county tax, general 4.1 mills; school purpose 1.6 mills; road and bridges 7 mills." The county owes $5,000 for debts contracted pursuant to state laws and incurred prior to November 7, 1916, when Section 11 was added to Article XI of the Constitution. The tax levy for 1917 was made in accordance with the budget for that year, and, exclusive of state taxes, the levy will. produce $61,120. It will cost $1,200 to hold an election in Curry County. If during 1917 the county expends the full amounts estimated for the several items mentioned in the budget and if the county also incurs a debt of $1,200 for holding an election, the total indebtedness will exceed $5,000; but this conclusion rests on the assumption that the county has no income except from the tax levy made in December, 1916.

PEREMPTORY WRIT ISSUED.

For petitioner, Mr. James Withycombe, Governor, there was a brief with oral arguments by *Mr. George M. Brown,* Attorney General, and *Mr. Isaac H. Van Winkle.*

For defendants there was a brief with oral arguments by *Mr. Samuel M. Endicott* and *Mr. Walter C. Winslow.*

Mr. Justice Harris delivered the opinion of the court.

The officials of Curry County offer three excuses for their refusal to prepare for holding the special election. The first excuse arises out of the fact that the budget for 1917 makes no provision for an election; the second proceeds upon the theory that the expense of the election will increase the indebtedness of the county beyond the maximum limit fixed by Article XI, Section 11 of the Constitution; and the third is predicated upon the contention that the tax levy for 1918 will necessarily be raised over and above the increase permitted by Article XI, Section 11 of the organic act. In brief, the defendants argue that there is no election fund available to pay the cost of the election; that the expense of the election will increase the indebtedness beyond the limit fixed by the Constitution; and that to raise the money to pay the expense of the election will require a levy for 1918 in excess of the limit allowed by the Constitution. Since the defenses interposed by the defendants grow out of the budget law and Sections 10 and 11 of Article XI of the Constitution, it will be appropriate first to call attention to the statute and the Constitution.

The budget law requires the County Court to make an estimate of the amount of money proposed to be

raised by taxation for the ensuing year. The statute directs that the estimate shall be fully itemized, showing under separate heads the amount required for each department of county government, county office, each county improvement, building, roads, bridges and

"shall contain a full and complete disclosure of the contemplated expenditures from the money or moneys proposed to be raised by taxation, showing the amount of each public expense."

The estimates and the tax proposed to be levied must be published together with a notice of the time and place at which the taxpayers can discuss the budget and proposed tax with the County Court. After the hearing is had, the County Court is directed to declare the amount of taxes to be raised and to make a levy sufficient to raise the necessary taxes,

"and no greater tax than that so entered upon the record shall be levied by the authority proposing such tax for the purpose indicated or collected, and thereafter no greater expenditure of public moneys shall be made for any specific purpose than the amount so estimated and 10 per cent thereof": Chapter 234, Laws 1913.

Article XI, Section 10 of the Constitution originally read thus:

"No county shall create any debts or liabilities which shall singly or in the aggregate exceed the sum of five thousand dollars, except to suppress insurrection or repel invasion; but the debts of any county at the time this Constitution takes effect shall be disregarded in estimating the sum to which such county is limited."

At the regular general election held on November 8, 1910, this section of the Constitution was amended to read as follows:

"No county shall create any debts or liabilities which shall singly or in the aggregate exceed the sum of five thousand dollars, except to suppress insurrection or repel invasion, or to build permanent roads within the county, but debts for permanent roads shall be incurred only on approval of a majority of those voting on the question": Laws 1911, p. 11.

At the next regular general biennial election held on November 5, 1912, the section was again amended and it now appears thus:

"No county shall create any debts or liabilities which shall singly or in the aggregate with previous debts or liabilities exceed the sum of five thousand dollars, except to suppress insurrection or repel invasion or to build and maintain permanent roads within the county; and debts for permanent roads shall be incurred only on approval of a majority of those voting on the question, and shall not either singly or in the aggregate with previous debts and liabilities incurred for that purpose exceed two per cent of the assessed valuation of all the property in the county": Laws 1913, p. 9.

A new section, designated as Section 11 of Article XI, was added to the Constitution at the election held on November 7, 1916, and it is here set out in full:

"Unless specifically authorized by a majority of the legal voters voting upon the question neither the state nor any county, municipality, district or body to which the power to levy a tax shall have been delegated shall in any year so exercise that power as to raise a greater amount of revenue for purposes other than the payment of bonded indebtedness or interest thereon than the total amount levied by it in the year immediately preceding for purposes other than the payment of bonded indebtedness or interest thereon plus six per centum thereof; provided, whenever any new county, municipality or other taxing district shall be created and shall include in whole or in part property theretofore included in another county, like municipality or

other taxing district, no greater amount of taxes shall be levied in the first year by either the old or the new county, municipality or other taxing district upon any property included therein than the amount levied thereon in the preceding year by the county, municipality or district in which it was then included plus six per centum thereof; provided further, that the amount of any increase in levy specifically authorized by the legal voters of the state, or of a county, municipality, or other district, shall be excluded in determining the amount of taxes which may be levied in any subsequent year.

"The prohibition against the creation of debts by counties prescribed in Section 10 of Article XI of this Constitution shall apply and extend to debts hereafter created in the performance of any duties or obligations imposed upon counties by the Constitution or laws of the state, and any indebtedness created by any county in violation of such prohibition and any warrants for or other evidences of any such indebtedness and any part of any levy of taxes made by the state or any county, municipality or other taxing district or body which shall exceed the limitations fixed hereby shall be void": Laws 1917, p. 12.

3. Recurring to the answer, the first defense is rested upon the provisions of the budget law. The argument is that Chapter 234, Laws 1913, commands that no greater expenditure of public moneys shall be made for any specific purpose than the amount estimated in the budget plus 10 per cent; that the budget made no provision for elections for the reason that the next regular election will occur in 1918; and that therefore to spend public moneys in 1917 for a special election would be to violate Chapter 234, Laws 1913. The budget law was enacted by the legislature and the same body passed Chapter 422, Laws 1917, providing for the special election. The authority that restricted the disbursements to specified purposes, can, subject

to certain exceptions not controlling here, afterwards remove those restrictions. The act of 1917 directing that a special election be held also carries with it an implied command that the several counties of the state pay the expenses of such election; and therefore the restrictions imposed by the earlier statute of 1913 are removed to whatever extent it may be necessary to release the county from that statute in order to permit compliance with the later statute of 1917.

The second and third defenses may be considered together since they depend upon tax and indebtedness limitations prescribed by the Constitution. Section 11 of Article XI is divided into two paragraphs. The first paragraph imposes a limitation upon the power to tax, while the second prescribes a limitation upon indebtedness. Notwithstanding the language employed in Section 11, it was earnestly argued that this section will not include indebtedness incurred in holding the special election, for the reason that such indebtedness would be involuntarily incurred in the performance of an obligation thrust upon it by the legislature. All doubts concerning the intent and the meaning of Section 11 will be removed if we first call attention to the construction that for more than a quarter of a century was placed upon Section 10, and if we then carry that construction with us and apply it as directed by Section 11. In *Grant County* v. *Lake County,* 17 Or. 453, 464 (21 Pac. 447), this court held that Section 10 only applied to debts and liabilities, which a county voluntarily created, and that it did not include involuntary indebtedness thrust upon it by operation of law. The first judicial construction placed upon Section 10 has been adhered to in every subsequent adjudication, whether the section was presented in its original or in its amended form; and no difference of opinion can

possibly exist concerning the accepted meaning of this provision of the Constitution: *Wormington* v. *Pierce,* 22 Or. 606, 614 (30 Pac. 450) ; *Burnett* v. *Markley,* 23 Or. 436, 440 (31 Pac. 1050) ; *Dorothy* v. *Pierce,* 27 Or. 373, 375 (41 Pac. 668); *Municipal Security Co.* v. *Baker County,* 33 Or. 338, 343 (54 Pac. 174) ; *Eaton* v. *Mimnaugh,* 43 Or. 465, 471 (73 Pac. 754) ; *Brockway* v. *Roseburg,* 46 Or. 77, 82 (79 Pac. 335) ; *Brix* v. *Clatsop County,* 46 Or. 223 (80 Pac. 650) ; *Cunningham* v. *Umatilla County,* 57 Or. 517, 519 (112 Pac. 437, 37 L. R. A. (N. S.) 1051); *Andrews* v. *Neil,* 61 Or. 471 (120 Pac. 383, 123 Pac. 32) ; *Bowers* v. *Niel,* 64 Or. 104 (128 Pac. 433) ; *Wingate* v. *Clatsop County,* 71 Or. 94 (142 Pac. 561) ; *Stoppenback* v. *Multnomah County,* 71 Or. 493 (142 Pac. 832). The obvious purpose of Section 11 is to broaden the prohibition of Section 10 and to include in the prohibition a kind of indebtedness not previously included. Manifestly, Section 11 is designed to include a class of indebtedness which the courts had previously said that Section 10 did not include. The extent of the enlargement of the prohibition is made plain and certain by expressly extending Section 10 to debts "created in the performance of any duties or obligations imposed upon counties by the Constitution or laws of the state." This language needs no extraneous words to aid in its construction, for it is unambiguous and self-construing. To hold that Section 11 does not apply to any involuntary indebtedness would be to deny the indisputable meaning of the clearest language. Standing alone, Section 10 applies to voluntary indebtedness; but, when aided by Section 11, it also applies to involuntary indebtedness, or debts created in the performance of duties and obligations imposed by the Constitution or laws of the state. Aside from the exceptions expressly specified

by the Constitution, a county is absolutely prohibited from incurring an indebtedness in excess of $5,000.

While it is not necessary to seek information outside the plain language found in Sections 10 and 11, yet it may be of more than passing interest to call attention to the discussions appearing in the public prints, prior to November 7, 1916, concerning the origin and purpose of the amendment to the Constitution. An organization known as the State Taxpayers' League caused the amendment to be framed and circulated the petitions for its submission to the voters. The pamphlets printed by the state and sent to all the voters expressly stated that the amendment had been ''Initiated by State Taxpayers' League''; and, furthermore, a printed argument made by the State Taxpayers' League in behalf of the amendment appeared in the voter's pamphlet. A monthly newspaper called ''The Tax Liberator'' was the avowed official publication of the Oregon Taxpayers' League. Copies of the paper are on file with the Oregon State Library. The publishers of this paper proclaimed that one of the purposes of the amendment was to place a limit on the power of disbursing officers to incur indebtedness. An extract from an editorial appearing in ''The Oregon Voter,'' a weekly publication, and republished on page two of the July, 1916, issue of the Tax Liberator reads thus:

''Emergencies there will be, requiring immediate, heavy expenditure. This applies to public as well as private business. The private business man knows that his income is limited; yet he must be ready to meet emergencies, and must take care of himself when they arise. The public bodies must learn the same lesson, they must learn that they must arrange public finances within the limit of income in such a way that emergencies can be met when they arise. This will

require saving and trimming in advance the same as a farmer or other man in private business must do. Facing a limit beyond which expense must not go will result ultimately in more careful financing and ample provision for emergencies. Absence of any limit simply results in adding the emergency expense to present running expenses, regardless of the size of the increased burden upon taxpayers."

Moreover, in answer to the argument that the proposed amendment would not be workable, the sponsors for the amendment claimed that in framing it they had "exactly followed the principles of the Colorado law which has proven to be most workable and entirely satisfactory to all concerned." Page 7, October, 1916, issue of The Tax Liberator. In this connection it is interesting to note that the Constitution of Colorado provides that

"the aggregate amount of indebtedness of any county, for all purposes, exclusive of debts contracted before the adoption of this Constitution, shall not at any time exceed twice the amount above herein limited, unless when, in manner provided by law, the question of incurring such debt shall, at a general election be submitted to"

the qualified electors. One Rollins held warrants issued by Lake County, one of the counties of Colorado, for the ordinary expenses, such as fees for witnesses and jurors, election costs, and charges for the board of prisoners. Rollins sued Lake County on the warrants. The county defended by contending that the warrants were void because issued after the county indebtedness had reached the limit fixed by the Constitution. The controversy finally reached the supreme court of the United States and it was there argued, as it has been here, that the prohibition expressed in the Constitution did not apply to "compulsory obligations"; but that

court sustained the defense made by the county and refused to assent to the argument that the Constitution recognized a difference between indebtedness incurred by the voluntary contracts of the county and that form of debt denominated as ''compulsory obligations'': *Lake County* v. *Rollins,* 130 U. S. 662 (32 L. Ed. 1060, 9 Sup. Ct. Rep. 651).

At the hearing, we were urged to adopt a construction which would enable counties to incur involuntary indebtedness, and in support of this plea it was argued that counties may at times experience difficulty in adequately performing the duties imposed upon them without exceeding the $5,000 indebtedness limitation; and, furthermore, it was suggested that some county may at some time in the future find itself temporarily weakened, or even paralyzed, by the restrictions laid upon it by Article XI, Section 11 of the Constitution. This argument is best answered by quoting the language employed by Mr. Justice LAMAR when disposing of a similar argument advanced against the Colorado Constitution in *Lake County* v. *Rollins,* 130 U. S. 662, 672 (32 L. Ed. 1060, 9 Sup. Ct. Rep. 651):

''If it was a mistaken scheme, if its operation has proved or shall prove to be more inconvenient than beneficial, the remedy is with the people, not with the courts.''

4, 5. Questions of policy and questions of what is best to insert in the Constitution must be regarded as having been conclusively settled when the legal voters adopted the amendment. The oath of the judiciary is to construe the Constitution as it is, and not as it might have been: *Hagan* v. *Commissioners Court of Limestone County,* 160 Ala. 544 (49 South. 417, 37 L. R. A. (N. S.) 1027); Gray on Limitations of Taxing Power and Public Indebtedness, § 2055.

However, this amendment to our Constitution does not involve a novelty, nor does it present an untried experiment. The Constitutions of some of the other states contain similar provisions, which, when presented to the courts for interpretation, have been construed to apply to both voluntary and involuntary indebtedness: *People* v. *May,* 9 Colo. 80 (10 Pac. 641); *Barnard & Co.* v. *Knox County,* 105 Mo. 382 (16 S. W. 917, 13 L. R. A. 244); *Grand Island & N. W. Co.* v. *Baker,* 6 Wyo. 369 (45 Pac. 494, 71 Am. St. Rep. 926, 34 L. R. A. 835); Gray on Limitations of Taxing Power and Public Indebtedness, § 2059.

6. Any debt contracted by Curry County in holding the special election would be an involuntary indebtedness incurred in the performance of a duty and obligation imposed by a law of the state; and therefore such a debt is prohibited if it exceeds the $5,000 limitation fixed by the Constitution. The organic law prevents the county from voluntarily assuming the debt and it also restrains the legislature from compelling the county to assume the debt if the maximum limit of indebtedness will be exceeded: *Lake County* v. *Rollins,* 130 U. S. 662 (32 L. Ed. 1060, 9 Sup. Ct. Rep. 651); 7 R. C. L. 952.

The next question for determination is whether, on the admitted facts, the special election will create an indebtedness in excess of $5,000. It will not be necessary to decide whether Article IX, Section 3 of the Constitution applies to the taxes levied for roads and schools; but for the purposes of this investigation we shall assume that the legislature cannot divert tax moneys levied for state or school, or road purposes: see *Northup* v. *Hoyt,* 31 Or. 524, 528 (49 Pac. 754); *Shattuck* v. *Kincaid,* 31 Or. 379, 394 (49 Pac. 758); *Miller* v. *Henry,* 62 Or. 4, 10 (124 Pac. 197, 41 L. R. A.

(N. S.) 97); *Guest* v. *City of Brooklyn,* 8 Hun (N. Y.), 97; *Mason* v. *Purdy,* 11 Wash. 591 (40 Pac. 130). We shall, therefore, first exclude all taxes levied for the state and also those levied for schools, roads and bridges. The remainder of the levy was for "county tax, general 4.1 mills." This levy will produce $19,037.60 for general county purposes.

7. Although the record does not reveal how much of the levy for general county purposes has actually been collected, nevertheless, after the levy is made the payment of the taxes is regarded as a legal certainty and for that reason our calculations must assume that Curry County has collected $19,037.60 for general county purposes: *Municipal Security Co.* v. *Baker County,* 33 Or. 338, 347 (54 Pac. 174). The record does not show how much of this amount has already been expended; but it is fair to assume that only such sum has been paid out as is proportionate to the expired portion of the year.

8. It is true that the budget shows that the county plans to expend the whole amount raised for general county purposes; and if the county carries out its plans it will be impossible to hold the special election without exceeding the $5,000 indebtedness limitation. In other words, if the county is permitted to do what it has planned to do it will pay out all the tax money for the items mentioned in the budget and there will be no money available to pay the cost of the election. The legislature, however, by the enactment of Chapter 422, Laws 1917, has in effect said to Curry County:

"If your plans require all your money, then you must change your plans; and, instead of using all your money as you have planned, you must set aside a sufficient sum to pay for the special election and only the balance remaining is available for your plans":

84 Or.—31

*Miller* v. *Henry,* 62 Or. 4, 7 (124 Pac. 197, 41 L. R. A. (N. S.) 97.).

Some of the items appearing in the budget are for voluntary purposes while the others are for involuntary obligations; and most of the involuntary obligations were originally imposed by the legislature. The legislative authority which imposed most of the involuntary obligations included in the budget, also created the duty of holding the special election; and the duty lately created is not necessarily of a lower rank than the obligations previously imposed. If there is not enough money to pay for both the voluntary and involuntary items, the latter will of course take precedence over the former; and if perchance because of a lack of funds the county cannot perform all the obligations imposed upon it without exceeding the debt limitation, nevertheless the necessity of obeying the Constitution is paramount and controlling.

However, it is not probable that the expenditure of $1,200 for the special election will be followed by the direful consequences suggested by the answer. The pleadings do not mention and no account has been taken of the revenues coming to the county from sources other than taxes. The fees paid to the various county officers for the county during the year undoubtedly aggregate a considerable sum and probably are more than enough to pay for holding the special election. If the income from fees and other sources aside from taxes, is sufficient to pay for the election then all the general county taxes will be available for the purposes mentioned in the budget and the county will be able to carry out its plans without exceeding the indebtedness limitation. The answer fails to show that the Constitution will be violated if the election is

held; and therefore the demurrer to the answer was properly sustained and the petitioner was entitled to a peremptory writ commanding the defendants to prepare for the election.   PEREMPTORY WRIT ISSUED.