Argued October 9, affirmed October 10, 1952

STATE ex rel. STADTER, JR. et al. *v.*
NEWBRY et al
248 P. 2d 840

*Jay Bowerman* and *James B. Castles,* of Portland, argued the cause for appellants. With them on the brief was Edward O. Stadter, Jr., district attorney for Marion County, of Salem.

*E. G. Foxley,* deputy attorney general, of Salem, argued the cause for respondents. With him on the brief was George Neuner, attorney general, of Salem.

Black, Kendall & Fain and Paul Gerhardt, of Portland, filed a brief as amici curiae.

Before BRAND, Chief Justice, and ROSSMAN, LUSK, LATOURETTE, WARNER and TOOZE, Justices.

LUSK, J.

This is a proceeding in mandamus brought in the Circuit Court for Marion County by the state of Oregon on the relation of the district attorney of that county and Dr. Frank R. Menne and Henry W. Collins, two of the five members of the State Racing Commission, against the defendants Earl T. Newbry, secretary of state; Walter J. Pearson, state treasurer; and Edwin H. Armstrong, the governor's executive secretary, to compel the performance by the defendants of what are claimed to be duties enjoined upon them by

law in connection with a certain initiative measure which will be voted upon at the general election on November 4, 1952.

The circuit court sustained a demurrer to the alternative writ based upon the ground of insufficient facts, and, the plaintiffs having refused to plead further, entered judgment for the defendants from which this appeal is taken.

Plaintiffs base their right to relief upon the provisions of ch 290, Oregon Laws 1951, which reads:

"Section 1. Whenever any measure which involves the expenditure of public money by the state, or the raising of funds by the state by imposing any tax or incurring any indebtedness, shall be proposed by initiative petition or referred to the people by referendum petition or by the Legislative Assembly, the Secretary of State, with the assistance of the State Treasurer and the Governor's Executive Secretary, shall estimate in dollars the amount of expenditure, tax revenue or indebtedness and interest which will be required to meet the provisions of such measure should it be enacted. Such estimate shall state the recurring annual amount involved or, if the measure does not involve such a recurring annual amount, the total amount. The estimate shall be certified by at least two of the officials named in this section and, not later than the ninetieth day before the election at which the measure is to be voted upon, such estimate shall be filed, together with the data upon which it is based, in the office of the Secretary of State in Salem, where, thereafter, it shall be available for public inspection. If the measure involves only administrative expenses not exceeding $50,000 per annum, such estimate shall not be printed in the voters' pamphlet or on the ballot as prescribed in section 2 of this Act.

"Section 2. The Secretary of State shall cause the estimate provided in section 1 of this Act to

be printed immediately following the ballot title of the measure to which it pertains when such measure appears in the voters' pamphlet published by him pursuant to section 81-2109, O.C.L.A., as amended. At the time the Secretary of State, pursuant to the provisions of section 81-2107, O.C.L.A., as amended, furnishes to the several county clerks the certified copy of the ballot title of any measure specified in section 1 of this Act, he shall furnish each county clerk his certified copy of the estimate provided in section 1 of this Act. It shall be the duty of each county clerk to print said estimate on the official ballot immediately following the ballot title of the measure to which it pertains.

"Section 3. Any person dissatisfied with the estimate as certified and filed pursuant to section 1 of this Act may appeal to the State Tax Commission for a review thereof by filing a petition with the tax commission within 10 days following the date on which the estimate is filed in the office of the Secretary of State. The petition shall set forth in detail wherein the estimate is alleged to be erroneous. The commission shall thereupon review the estimate and the relevant factual data, and if necessary revise the estimate so that it shall be substantially accurate. The estimate as reviewed and corrected by the tax commission shall be certified by it to the Secretary of State and shall be used and printed by the Secretary of State and the several county clerks in place of the original estimate as made pursuant to section 1 of this Act."

According to the recitals of the alternative writ of mandamus an initiative measure will be placed on the ballot at the election on November 4, 1952, to be voted upon by the electors, the purpose of which is to amend Sec. 4, Art. XV, of the constitution, which now reads:

"Lotteries, and the sale of lottery tickets, for any purpose whatever, are prohibited, and the legislative assembly shall prevent the same by penal laws."

If amended as proposed the section would read:

"No lottery shall be AUTHORIZED by the legislature or otherwise in this state and no ticket in any lottery, pari-mutuel betting on the result of horse, dog, or other animal racing, or vehicle racing shall be bought or sold within this state or offered for sale, nor shall bookmaking be authorized within the state, nor shall any gambling device be legalized, or the remedy, penalty, or punishment now provided therefor be in any way diminished."

The alternative writ recites that if the proposed constitutional amendment should be adopted, and pari-mutuel wagering on horse, dog and other animal racing should be eliminated, the loss to the state would be a minimum of $972,813.79, that being the difference between the amount received by the state of Oregon through the State Racing Commission for the fiscal year ending June 30, 1952, to wit, $992,813.79, and the expense of collecting such moneys, to wit, $20,000.00. It is further related that this information has been furnished to the secretary of state at the latter's request, but that the estimate required by ch 290, Oregon Laws 1951, was not made by the secretary of state, the state treasurer, and the governor's executive secretary because they had been advised in an opinion of the attorney general that the statute was not applicable to the initiative measure in question. The command of the alternative writ is that the defendants forthwith make the estimate and ascertain the loss of tax revenue which the state of Oregon will suffer if the proposed amendment of Sec. 4, Art. XV, of the Oregon constitution is adopted at the general election to be held on November 4, 1952; that said estimate be certified by at least two of the defendants and filed, together with the data upon which it is based, in the office of the secretary of state; that the defendant

secretary of state cause said estimate to be printed immediately following the ballot title of the proposed constitutional amendment when it appears in the Voters Pamphlet; and, further, that the secretary of state furnish each county clerk his certified copy of said estimate to be included following the ballot title of said proposed constitutional amendment on the official or white ballots and sample ballots to be printed, distributed, and used as provided by law when the secretary of state furnishes to the several county clerks the certified copy of the ballot title of the proposed constitutional amendment.

There is grave question whether this is not a moot case. See, *State v. Stannard,* 84 Or 450, 453, 165 P 566, 165 P 571. The estimate provided for in Sec. 1, ch 290, Oregon Laws 1951, is required to be filed in the office of the secretary of state "not later than the ninetieth day before the election at which the measure is to be voted upon  *  *  *". The ninetieth day prior to November 4, 1952, the date of the election, was August 5, 1952. The Voters Pamphlets in which the estimate must be published have been printed and distributed to the registered voters. The secretary of state has long since certified the ballot titles and numbers of the initiative and referendum measures to be voted upon as required by ch 55, Oregon Laws 1949, and it is highly probable that, in accordance with the duties imposed upon the county clerks of the respective counties by ch 50, Sec. 11, Oregon Laws 1945, in many of the counties the ballots have already been printed. Notwithstanding that the attorney general gave his opinion to the secretary of state that ch 290 does not apply to the measure in question on July 29, 1951, and notwithstanding, as the record shows, the plaintiffs had knowledge of the opinion on August 7,

this proceeding was not commenced until September 16, 1952, and there is no explanation of the delay. Whether, assuming the correctness of the plaintiffs' position, a mandate of this court would in these circumstances be effective, is exceedingly doubtful. Certainly the situation suggests the advisability of parties acting promptly in cases of this kind and pursuing their remedies with diligence. Otherwise they run the risk that the court, in the exercise of its discretion, will dismiss the proceeding for laches. There is an additional reason for doing so when the court is called upon, as it is in this case, to decide in the briefest possible time a question of importance to which it would prefer to give, and perhaps should give, its accustomed mature and deliberate consideration.

Nevertheless, we shall determine the case on its merits, even though it be moot, and notwithstanding the want of diligence of the plaintiffs. We are moved to do so by the general public interest in the question. *Perry v. Oregon Liquor Commission,* 180 Or 495, 499, 177 P2d 406. We are the more persuaded that this is the course which duty dictates because of the distinct possibility that, absent decision now, there may be litigation in the future contesting the validity of the election as to the constitutional amendment here involved in the event that the people should vote to adopt it.

■ Fortunately the matter of construction of the statute and its application to the proposed amendment presents no great difficulty. We are concerned mainly with the first sentence of Sec. 1, which reads:

"Whenever any measure which involves the expenditure of public money by the state, or the raising of funds by the state by imposing any tax or incurring any indebtedness, shall be proposed

by initiative petition or referred to the people by referendum petition or by the Legislative Assembly, the Secretary of State, with the assistance of the State Treasurer and the Governor's Executive Secretary, shall estimate in dollars the amount of expenditure, tax revenue or indebtedness and interest which will be required to meet the provisions of such measure should it be enacted.  *  *  * ''

The Act applies to any initiative or referendum measure ''which involves the expenditure of public money by the state, or the raising of funds by the state by imposing any tax or incurring any indebtedness * * *.'' It applies to nothing else. Where the Act is applicable, the secretary of state, with the assistance of the state treasurer and the governor's executive secretary, is required to estimate ''the amount of expenditure, tax revenue or indebtedness and interest which will be required to meet the provisions of such measure should it be enacted.'' The estimate so made, popularly referred to as a ''price tag'', must be filed in the office of the secretary of state where it shall be available for public inspection, printed immediately following the ballot title of the measure in the Voters Pamphlet and likewise printed on the official ballot immediately following the ballot title of the measure to which it pertains. We may agree at once with counsel for the plaintiffs that the object intended to be accomplished by this Act is to give information to the voters of the state concerning the cost to the state of any initiative or referendum measure (if enacted into law) to which it applies and thus to aid the voter to exercise his franchise the more intelligently. The question here is whether the Act applies to the proposed amendment of the anti-lottery section of the constitution.

The contention of the plaintiffs as we understand it, is that the initiative measure in question ''in-

volves''[①] the raising of funds by imposing a tax or by incurring an indebtedness, because, if the measure is adopted, the state will lose nearly a million dollars a year that it is now receiving from pari-mutuel betting on horse and dog racing, and that it will be necessary to make good this loss by the imposition of a tax or the incurring of an indebtedness, as, for example, by a bond issue.

■ The difficulty with the contention is that it assumes as a fact something of which there is no evidence. Certainly, the initiative measure itself says nothing, either in express words or by remote implication, about raising funds by imposing a tax or incurring an indebtedness, or about raising funds at all. Broadly speaking, it is a constitutional amendment to abolish pari-mutuel betting on horse and dog racing—that and nothing more. It "involves" nothing which touches the public revenues except, of course, the loss of a portion of them. Whether a new tax or an issue of bonds will be resorted to for the purpose of making up the loss, or whether the legislature will decide to economize in some direction and make it up in that manner—these are matters for the future determination of the legislative branch of the state government; but they are certainly not determined or "involved" or hinted at one way or another in the initiative measure.

If there were any doubt about the correctness of this view, and it seems to us that there cannot be, it would be at once dispelled by a consideration of the concluding part of the sentence which provides for the "price tag" or estimate. What are the three desig-

---

[①] Webster's New International Dictionary defines *involves*: "To roll up in itself so as to gather in, embrace, or comprehend; to include; as, this problem *involves* the others. Specific., to contain by implication; to require as implied elements, antecedent conditions, effect, etc.; as, surrender *involves* submission."

nated administrative officials directed to do? They are to "estimate in dollars the amount of expenditure, tax revenue or indebtedness and interest which will be required *to meet the provisions of such measure should be enacted.*" (Italics added.) Clearly, no tax revenue or indebtedness is required to meet the provisions of a constitutional amendment which abolishes pari-mutuel betting. The plaintiffs tell us in argument they are entitled to a writ which will command the defendants to estimate in dollars the tax revenue or indebtedness required to meet, not the provisions of the measure by which the anti-lottery provision of the constitution would be amended, but the provisions of some other measure or measures imposing a tax or providing for the incurring of an indebtedness, which may or may not be adopted at some future date. Were the court to make peremptory the command of the alternative writ, it would order the administrative officials to "make the estimate and ascertain the loss of tax revenue which the State of Oregon will suffer" if the proposed constitutional amendment is adopted by the people. We think that the defendants are charged with neither of these duties by ch 290, Oregon Laws 1951, and that, if the court should issue any such writ, its order would go far beyond the provisions of the statute.

The argument that it is just as desirable to provide the voters with information concerning the cost to the state of a measure such as the proposed constitutional amendment, as it is to do so in the case of measures imposing taxes (some of which are on the November 4 ballot and have "price tags" attached to them) is a proper one to be addressed to the legislature, but not to the courts. We are not concerned

with the expediency of the statute, but with its meaning, which seems to us to be clear.

Neither do we think that the legislative history to which counsel for plaintiffs has called our attention is entitled to weight as an aid to interpretation. The measure, which was introduced as House Bill No. 489, contained no reference originally to the raising of funds by a tax or the incurring of indebtedness. Section 1 provided in part: "Whenever any measure for the expenditure of public money by the state shall be proposed by initiative petition", etc. Before the bill was finally passed the words "which involves" were substituted for the word "for", and the words "or the raising of funds by the state by imposing any tax or incurring any indebtedness" were inserted after "for the expenditure of public money by the state", and a corresponding change was made in the provision for the estimate. The plaintiffs argue that substitution of the words "which involves" for the word "for" indicates a change in purpose from the bill as originally introduced which supports the construction for which they contend. The contention lacks persuasiveness. To conclude that the legislature intended a change in meaning by this change in language is pure speculation. It is just as reasonable to say that, while engaged in the inclusion in the bill of matters not theretofore covered, it altered the language from "for" to "which involves" as a more appropriate way of expressing the same intention.

■ We have given consideration to ch 549, Oregon Laws 1951, which, it is contended by counsel for the plaintiffs, should be read *in pari materia* with ch 290. Chapter 549 reads:

"Section 1. Twenty days prior to any election at which any legislative or constitutional measure

involving the raising or expenditure of funds; by the state is to be submitted to the people of the state pursuant to initiative or referendum, and in any event 20 days prior to each regular general biennial election, there shall be filed in the office of the Secretary of State and made public a condensed, understandable and impartial statement showing the anticipated state General Fund requirements, revenues and balances under existing laws for the whole of the fiscal biennium then current. There shall be attached to any such statement an exhibit containing a brief, understandable and impartial written explanation of (a) the statement for the biennium then current, (b) the fiscal changes anticipated for the following biennium, and (c) such other matters as may be deemed desirable to advise the public of the current and anticipated condition of the finances of the state. Each such statement and exhibit shall be prepared and certified by the Governor's Executive Secretary and the State Tax Commission, and shall be approved by the Board of Control."

It will be observed that this Act is not concerned with information to be printed on ballots or in the Voters Pamphlet. It is doubtful, indeed, if it calls for the kind of an estimate prescribed by ch 290. Its general purpose, no doubt, is to acquaint the voters with the state of the public finances; but it in no way aids in the construction of ch 290, and certainly has no tendency to support the plaintiffs' views upon that subject.

For the foregoing reasons, the judgment of the circuit court is affirmed.