Argued January 4, decided January 23, rehearing denied April 23, 1912.

## ANDREWS v. NEIL.

[120 Pac. 383: 123 Pac. 32.]

COUNTIES—INDEBTEDNESS—CONSTITUTIONAL PROVISIONS—SUBMISSION TO VOTERS.

Under Article XI, Section 10 of the Constitution, as amended in 1910, providing that no county shall create any debts exceeding $5,000, except to build permanent roads within the county, on approval of a majority of those voting on the question, does not confer any new power on counties, which are empowered by statute to incur obligations only in the form of county warrants; and a county may not issue bonds for permanent roads on the majority of the electors voting in favor of bonds at an election called for that purpose, but not called pursuant to Article IV, Section 1a, for the purpose of enacting legislation.

From Jackson:  FRANK M. CALKINS, Judge.

Statement by MR. JUSTICE BURNETT.

This is a suit instituted by Ed. M. Andrews, a resident freeholder and taxpayer of Jackson County, against J. R. Neil, as the county judge of Jackson County, Oregon; George L. Davis and James Owen, as the county commissioners of said Jackson County, Oregon, constituting and being the county court of Jackson County, Oregon; W. R. Coleman, as the county clerk of said Jackson

County, Oregon, and Jackson County, Oregon, to enjoin them "from either ordering, issuing, or causing to be issued, negotiated, or sold," the bonds or other obligations of the county in the sum of $1,500,000 in excess of more than $5,000 voluntary indebtedness of the county already contracted. The plaintiff asserts that the defendants, composing the county court and its clerk, threaten to and are preparing wrongfully to negotiate $1,500,000 of county bonds or other securities, for the purpose of constructing permanent roads in that county, in consequence of which, unless the same be enjoined, his burden of taxation will be greatly increased, to his irreparable damage.

After denying in the answer the wrongfulness of the purposes imputed to them, the defendants trace, with great wealth of detail, the history of the adoption of the constitutional amendment, hereinafter discussed, even going to the extent of quoting at length the argument published in the political pamphlets for use at the hustings when the measure was submitted to the people, and seek to justify under that amendment. Reduced to its lowest terms, the substance of the answer is that, being urged thereto by the petition of numerous taxpayers of the county, the defendants, county judge and commissioners, called an election for September 30, 1911, and submitted to the electors the question: "Shall the county create indebtedness not to exceed $1,500,000 for the building of permanent roads therein, said indebtedness being in addition to the interest and to its present indebtedness, and independent of any other indebtedness, however created, and to be evidenced by the 20-year bonds of said county, drawing interest at not to exceed 6 per cent per annum?" and, being so advised by an affirmative majority of the votes cast at said election, they are proceeding to issue and negotiate such bonds, or so much of them as may be deemed necessary to

raise money for the purpose named. The circuit court overruled a general demurrer to the new matter of the answer, and, as the plaintiff elected to stand on his demurrer, made a decree dismissing the suit. The plaintiff appeals.          REVERSED: REHEARING DENIED.

For appellant there was a brief and oral arguments by *Mr. Porter J. Neff* and *Mr. Clarence L. Reames.*

For respondents there was a brief over the names of *Mr. Allen E. Reames* and *Mr. O. H. Lawler*, with an oral argument by *Mr. Reames.*

MR. JUSTICE BURNETT delivered the opinion of the court.

At the election held in 1910, the people of the State, by the initiative process, amended Section 10, Article XI, Constitution of Oregon, so as to read as follows:

"Section 10.   No county shall create any debts or liabilities which shall singly or in the aggregate exceed the sum of $5,000.00, except to suppress insurrection or repel invasion, or to build permanent roads within the county, but debts for permanent roads shall be incurred only on approval of a majority of those voting on the question."

Of this amendment the courts will take judicial notice, the same as of any other law of the land. It is unnecessary to plead the same. Much less is it requisite to set out the history of the adoption of the amendment, or the arguments used to carry the measure.

It is conceded that the voluntary debt of Jackson County incurred since the people adopted the original Constitution of the State far exceeds $5,000. The question presented here involves the construction of the amendment, above quoted, in its application to the facts stated in the answer. The issue includes not only the amount, but also the form, of the proposed indebtedness.

The amendment confers no new power upon . any

county. Every county has always had the power to create debts for the purpose of building permanent roads, provided the voluntary liabilities of the county should not be increased thereby to exceed $5,000. Hitherto the establishment of county roads has been one of exclusive functions of county courts. Sections 937, 6278, *et seq.,* L. O. L. The ideal of an imperishable road surface has not yet been attained, and probably never will be, but many highways have been permanently established by the authority of the county courts. The lawmaking power has prescribed the manner in which county indebtedness is created. It is in the form of county orders or warrants. Only upon proper orders issued and attested by the county clerk is the county treasurer authorized to disburse the county funds. Section 2954, L. O. L. The only innovation made by the amendment upon the previous order of public affiairs is to change the form of restriction upon the power to go in debt for the particular purpose named. All the affirmative authority of the county court exists now just as it did before.

The contention of the defendants, in its ultimate analysis, is that the quoted section of the constitution as it now stands is self-executing, and invests the county with full discretion to devise the means of securing the "approval of those voting on the question," so long as it is ascertained by voting in some manner, and that no legislation is necessary on that subject. That an election of some kind will be necessary to remove the restriction upon the amount of indebtedness for permanent roads may well be implied. The question on this branch of the case is whether an election has been authorized. The amendment in question must be construed, if possible, to stand with the rest of the constitution; for the people inaugurated constitutional gov-

ernment, and have not yet abandoned the consti-
tution they promulgated in the beginning.    Section 8 of
Article II provides as follows:

"The legislative assembly shall enact laws to support
the privilege of free suffrage, prescribing the manner
of regulating and conducting elections, and prohibiting,
under adequate penalties, all undue influence therein
from power, bribery, tumult and other improper
conduct."

Of course, this section cannot be construed to exclude
the rights of the people to legislate on the subject of
elections, under the terms of Section 1 of Article IV,
known as the "original initiative and referendum section."
It is clear, however, that until the legislative power of
the State has declared that an election shall be held
on a particular kind of question no decision of such a
question can be worked out in that manner.    As stated
by Judge BEAN, in *State ex rel.* v. *Simon,* 20 Or. 365
(26 Pac. 170).    "An election, in order to be valid, must
be held in pursuance of the provision of some law author-
izing it, in force at the time.    There is no inherent
reserve power in the people to hold an election."

In that case the act incorporating the city of Portland
provided that the Governor should appoint a board of
three police commissioners, who should hold office for
one, two, and three years respectively, from the first
Monday in July, 1886, their respective terms to be
determined by lot, and, commencing with the general
election to be held in the city on the third Monday in
June, 1887, there should be elected annually one com-
missioner, who should hold his office for three years,
and until his successor should be elected and qualify.
All vacancies were to be filled by appointment made by
the mayor, with the consent of the majority of the
council.    The commissioners were to take the oath of

office required of the other city officers, and enter upon their duties within 10 days after their appointment by the Governor, or on the first Monday in July succeeding their election, when elected by the people. Joseph Simon was appointed by the Governor one of the commissioners, and secured the three-year term in the allotment. Before his term had expired, the legislature amended the act creating the commission. In substance, the amendment was the same as the former act, except that all provisions concerning appointment by the Governor, term of office, time and place of election of these officers, were omitted, and the following was inserted in lieu thereof:

"The police commissioners now in office shall hold their respective offices until their successors are elected and qualified."

The mayor's power of appointment was also limited to vacancies caused by death or resignation. At the city election following this amendment, Richard Everding was a candiate for the office of police commissioner, and received all the votes cast for the office. Having duly qualified, he demanded from Simon the possession of the office, which was refused; hence the proceeding in that case. Although the act provided that the police commissioners should hold office until their successors were elected and qualified, although there was a provision in the charter for a general election at which other officers should be elected, yet, inasmuch as the act did not provide for an election for the particular office in question, the court, after mature consideration, in a carefully reasoned opinion by Justice BEAN, held that the election at which Everding was a candidate and received all the votes was a nullity, and conferred no right upon him to the office in question.

We apply the principles announced in that case in

this way to the matter in hand. The legislative power
of the State has prescribed with great detail a manner
of electing public officers, and by the initiative and
referendum system, and legislation in pursuance thereof,
it has provided a manner of voting upon legislative
questions by the people; but it has not in any manner
established a method of taking a vote upon the question
of incurring indebtedness by counties in excess of the
original constitutional limit. For the reason that the
authority to declare the time and manner of conducting
such election upon such a question is vested in the law-
making power of the State, either in the legislative
assembly or in the people at large, and that no such
action has been taken, no prerogative is vested in county
courts to call an election on such a question.

As a restraining, negative force, the amendment in
question is self-executing. The mere fact that debts
for permanent roads shall be incurred only on approval
of the majority of those voting on the question does not
give affirmative authority to incur such monetary obliga-
tions, or to hold an election for the purpose of ascer-
taining the will of the people on the question. Even if
we could imply positive authority from the terms of the
amendment, the utmost that could be said of it is that
it enunciates the principle, but does not promulgate any
plan for carrying it into effect. A constitution usually
does not deal with details of execution, and for construct-
ive purposes it cannot be held to be self-executing, unless
it provides a reasonable procedure for that purpose.
As said by Justice EAKIN, in *Stevens* v. *Benson,* 50 Or.
269 (91 Pac. 577) : "A constitutional provision is said
to be self-executing if it enacts a sufficient rule, by
means of which the right given may be enjoined and
protected. The language used, as well as the object to
be accomplished, is to be looked into in ascertaing the

intention of the provision." See, also, *Long* v. *City of Portland,* 53 Or. 92 (98 Pac. 149, 1111). In Cooley's Constitutional Limitations (7 ed.) p. 892, that learned author very aptly says:

"The voice of the people acting in their sovereign capacity can be of legal force only when expressed at the time and under the conditions which they themselves have prescribed, and pointed out by the constitution, or which, consistently with the constitution, has been prescribed and pointed out for them by statute, and if by any portion of the people, however large, an attempt should be made to interfere with the regular working of the agencies of government at any other time, or in any other mode, than as allowed by existing law, either constitutional or statutory, it would be revolutionary in character, and must be resisted and repressed by the officer who, for the time being, represents legitimate government."

We conclude, then, that, notwithstanding the principle has been announced by the amendment that debts for permanent roads shall be incurred only on approval of the majority of those voting on the question, yet, because the amendment did not provide a means of ascertaining the will of the majority of those voting on the question, and none has been otherwise authorized by legislation, the constitutional amendment alluded to is not in that respect self-executing, and the will of the majority was not legally ascertained by the proceedings of the county court in respect to the election mentioned in the answer. The restriction upon the creation of debts for the purpose named was not legitimately removed; and hence the election did not amount to any authority for the county court in its attempts to issue and negotiate bonds.

Under the legislation as thus far adopted in this State, no county is authorized to borrow money or to issue bonds. The legislative power has prescribed the form of the obligation of the county for its indebtedness to

be in the shape of county order or warrants. This
being the rule for evidencing indebtedness of the county,
it must be held to exclude every other method, in the
absence of further legislation. Upon good reason, there
is a very material difference between borrowing money
and incurring an indebtedness. As very fittingly said
by Justice Selden, in *Ketchum* v. *City of Buffalo,* 14
N. Y. 356, 366: "A critical examination will show that
there is a very material difference between the two. If
the power of the corporation to use its credit is limited
to contracting directly for the accomplishment of the
object authorized by law, then the avails or consider-
ation of the debt created cannot be diverted to any
illegitimate purpose. The contract not only creates the
fund, but secures its just appropriation. On the con-
trary, if the money may be borrowed, the corporation
will be liable to repay it, although not a cent may ever
be applied to the object for which it was avowedly
obtained. It may be borrowed to build a market and
appropriated to build a theater, and yet the corporation
would be responsible for the debt. The lender is in no
way accountable for the use made of the money."

It is not necessary to decide here whether counties
have the authority to legislate under the provisions of
Section 1a, Article IV, Constitution of Oregon, for it is
not pretended that Jackson County attempted to engage
in legislation according to the plan delineated by the
enabling act of 1907 (Section 3470, *et. seq.* L. O. L.),
or otherwise. The procedure was purely administrative
in its nature, and not legislative. These defendants seem
to have assumed that it was lawful to issue interest-
bearing, negotiable bonds, without reference to the
present statute evidencing county indebtedness by means
of its county orders. The thing which appears to have been
done by the county court was to call an election for the

single purpose of ascertaining whether the majority of those voting at that election, upon the question submitted, would approve the creation of a million and a half dollars of indebtedness, to be secured by bonds issued for the purpose of borrowing that amount of money, or so much thereof as might be necessary for the purpose of constructing permanent roads in the county. No initiative petition inaugurating any legislative process appears in the record. Indeed, it does not seem to be contended for the defendants that they observed any of the rules prescribed by legislation for the manner of exercising the initiative and referendum powers reserved to the people of the several municipalities and districts mentioned in Section 1a of Article IV, Constitution of Oregon.

In our judgment, the distinction between incurring indebtedness and borrowing money for any specific purpose is well founded in reason; that, in the absence of further legislation upon the subject, no county is authorized to depart from the rule already established in respect to evidences of county indebtedness; and that the issue of negotiable, interest-bearing bonds is not authorized by the law in its present condition.

For these reasons, the decree of the circuit court is reversed, and a decree here entered in accordance with the prayer of the complaint.

REVERSED : REHEARING DENIED.

MR. JUSTICE BEAN delivered the following concurring opinion.

I concur in the result of this opinion, but do not give my assent to the following expressions, namely: "It is clear, however, that until the legislative power of the State has declared that an election shall be held on a particular kind of question no decision of such a question can be worked out in that manner." This would

appear to assume that no enabling act has been passed. And further: "The legislative power of the State has prescribed with great detail a manner of electing public officers, and by the initiative and referendum system, and legislation in pursuance thereof, it has provided a manner of voting upon legislative questions by the people; but it has not in any manner established a method of taking a vote upon the question of incurring indebtedness by counties in excess of the original constitutional limit. For the reason that the authority to declare the time and manner of conducting such election upon such a question is vested in the lawmaking power of the State, either in the legislative assembly or in the people at large, and that no such action has been taken. * *" And: "* * Yet, because the amendment did not provide a means of ascertaining the will of the majority of those voting on the question, and none has been otherwise authorized by legislation. * *"

My views upon a kindred question are expressed in an opinion this day rendered in the case of *Schubel* v. *Olcott,* 60 Or. 503 (120 Pac. 375), and it is unnecessary to further indicate them here.

MR. CHIEF JUSTICE EAKIN and MR. JUSTICE MCBRIDE delivered the following concurring opinion.

We concur in the result reached by Justice BURNETT, but are of the opinion that the county can, be a local law submitted to the voters at a regular election, provide for creating an indebtedness and the issuance of bonds for the purpose of building permanent roads.

---

Decided April 23, 1912.

## ON PETITION FOR REHEARING.

[123 Pac. 32.]

MR. JUSTICE MCBRIDE delivered the opinion of the court.

Sig 16

In an able and vigorous petition filed by counsel for respondents, we are asked to state definitely the views of this court as to whether a county can, by a local law submitted to the voters at a general election, provide for the creation of an indebtedness and the issuance of bonds for the purpose of building permanent roads.

The present case was taken up out of its regular order, and a decision expedited, at the request of the parties, in order that the county authorities might be informed as to the validity of the attempted election, which had been held for the purpose of authorizing a bonded indebtedness. The validity of that special election and the authority for holding it were the only questions before the court, and are the only questions which this record presents. But, in view of the fact that the writer of the opinion in that case intimated therein that there was a lack of authority in counties to hold such an election under any circumstances, other members of the court as a matter of first impression, and not deeming that question to be involved, thought best to qualify such expressions, and hold their judgment on that question in reserve, until occasion should properly arise for its exercise. Any opinion expressed in this case, upon what might be the result if another election should be held, would be merely dictum, and of no more authority than if the judges individually had announced the same views upon the street corners.

The effect of attempting such county legislation, without a further enabling act, has never been thoroughly analyzed in any argument made in this court. For instance, if the county passes a local law, who shall be its custodian, how shall it be promulgated, and where shall it be recorded and authenticated and published, so that the public generally shall take notice of its provisions? These and other matters of detail are too

grave, too important, and too far-reaching in their con-
sequences, and their omission in the amendment too
suggestive of an intent on the part of the framers of
the amendment to leave them for future settlement by
legislation, for us to pass upon them in a haphazard
manner in a case in which they are not involved. We
do not say that any of the difficulties suggested are
insuperable, because that question is not before us; but
it should be remembered that this court cannot by mere
fiat make or amend the law, or provide forms of pro-
cedure, and that in many matters pertaining to the tax-
ing powers our decisions are not final.

The value of a bond issue, or even of an issue of
county orders · in the ordinary form, depends upon the
opinion of lawyers and purchasers as to their validity,
and any dictum of ours in advance as to their regularity
or validity would only tend to confusion and uncertainty.
The petition is denied.

REVERSED : REHEARING DENIED.