Argued May 19, demurrer to writ sustained and proceeding dismissed July 6, rehearing denied orally October 5, 1920. On second rehearing, former opinion set aside and writ sustained February 8, 1921.

## HAWLEY *v.* ANDERSON, COUNTY JUDGE.

### (190 Pac. 1097; 195 Pac. 358.)

Constitutional Law—Amendment to Constitution not Self-executing —Counties — Increase of Indebtedness for Permanent Roads — Statute for That Purpose.

1. Amendment of Article XI, Section 10, of the Constitution, in 1919 (see Laws Sp. Sess. 1920, p. 5), to permit counties to incur indebtedness for permanent roads up to 6 per cent of the assessed valuation, is not self-executing so as to enlarge the debt limit without the enactment of a statute for that purpose.

Constitutional Law—Amendment—Limiting Indebtedness of Counties—Power of Legislature to Limit Indebtedness to a Smaller Amount Than by the Amendment.

2. Since the legislative powers of the state are absolute except as limited by the Constitution, the legislature can limit the indebtedness of a county to a smaller amount than the limit fixed by an amendment to the Constitution.

Constitutional Law—Amendment Increasing Debt Limit Does not Change Statute Fixing Old Limit.

3. The amendment to Article XI, Section 10 of the Constitution (see Laws Sp. Sess. 1920, p. 5), limiting county indebtedness for permanent roads to 6 per cent of the assessed valuation, not being self-executing, does not increase the limit of 2 per cent fixed by General Laws of 1913, page 175, Section 19, passed in accordance with the Constitution prior to its amendment.

Counties—Election for Excessive Bond Issue Does not Authorize Issue Up to Limit.

4. An election for the issuance of county road bonds under General Laws of 1913, page 170, Section 4 of which requires the

---

1. Self-executing provisions of Constitutions, see notes in 7 Ann. Cas. 627; 18 Ann. Cas. 199; Ann. Cas. 1914C, 1116; 16 L. R. A. 281.

order to declare the minimum amount to be expended upon each specified road, which authorized the issuance of bonds in excess of the limit prescribed by Section 19 of that act, does not permit the issuance of bonds up to that limit, since the bond issue of the smaller amount presents an entirely different question from that submitted.

### ON SECOND REHEARING.

**Constitutional Law—A Constitutional Amendment may Amend or Repeal Prior Conflicting Law.**

5.   While a constitutional amendment is a higher law than a legislative enactment, it has the same effect upon existing legislation, and may amend or repeal a prior constitutional or statutory provision conflicting with it if such is its necessary effect or intent.

**Constitutional Law — Statutes — Constitution or Statute Construed With Reference to Circumstances.**

6.   Courts in determining the construction of a Constitution or statute will consider the circumstances under which it was enacted and the mischief to be remedied with a view to construing it if reasonably possible to correct the supposed defect.

**Constitutional Law—Constitutional Amendment Increasing Debt Limit Held Self-executing.**

7.   In view of Article XI, Section 7, of the Constitution, and the original Section 10, as amended in 1910 (see Laws 1913, p. 9), relating to limit of indebtedness, and Laws of 1913, page 170, furnishing the election machinery for incurring indebtedness, the 1919 amendment to Section 10 (see Laws Sp. Sess. 1920, p. 5) changing the limit from 2 to 6 per cent of assessed valuation of county property for highway purposes became effective without additional legislation, since, if not self-executing, there was sufficient election machinery for carrying it into effect.

**Constitutional Law—Amendment Takes Effect at Once if There is Proper Legal Machinery for Its Exercise.**

8.   A constitutional amendment takes effect at once when there is at the time of its adoption legal machinery by which its mandate can be enforced or its privileges exercised, even if not self-executing: that is, not furnishing by its own terms such necessary legal machinery.

**Constitutional Law—Legislative Construction Entitled to Weight.**

9.   The legislative construction of the effect of a constitutional amendment is always entitled to weight in determining its construction.

## Original proceeding in Supreme Court in *Mandamus.*

6.   Proceedings of constitutional conventions as aid in construing Constitution, see note in 10 **Ann. Cas.** 1146.

In Banc.

This is an original proceeding in *mandamus*. The alternative writ, heretofore issued herein, recites the various steps taken by legal voters of Clackamas County petitioning for an election upon the question of issuing bonds for the construction of permanent roads in the county, and the several proceedings had thereupon by the County Court, resulting, finally, in an election wherein a majority of the votes cast favored the issue of 3,400 bonds of the denomination of $500 each, including the final order for such issue, and the advertisement of the sale of a portion of such bonds, including $70,000, par value, maturing in six years, and $70,000, par value thereof, maturing in seven years. It is further recited that the plaintiff submitted bids for the purchase of 100 of such bonds maturing in six years, and 100 thereof maturing in seven years, at par, plus accrued interest; that the County Court accepted such bids, and plaintiff has tendered payment therefor in accordance with the terms of his bids, but that defendants have failed and refused to make delivery. From the exhibits which are attached to and made a part of the writ, it appears that the proceedings were had under the provisions of Chapter 103, General Laws of Oregon for 1913. In the order made by the County Court declaring the result of the election, in accordance with Section 11 of the Act of 1913, Chapter 103, occurs the following recital:

"And it further appearing to the court that the total assessed valuation of all property within Clackamas County, Oregon, as shown by the assessment-roll of 1918 and upon which the taxes payable in 1919 are levied, is $28,968,526.48, and that there are no bonds outstanding against Clackamas County for

99 Or.—13

permanent road purposes and remaining unpaid at this time, or at the time of the authorization of this bond issue."

This excerpt is of interest in connection with the fact that the bond issue involved amounts to $1,700,000.

Section 19 of the act reads thus:

"No bond shall be issued under this act that will in the aggregate, together with the bonds outstanding, and the bonds offered to be sold, be in excess of two (2) per cent of the assessed valuation of the county at the time the bonds are issued."

Section 4 of the act requires that the order calling the election shall declare, among other things, the *minimum* amount to be expended upon each specified road, and the County Court, in obedience to this mandate included in the order, this recital:

"It is further ordered that the following described roads in Clackamas County be built and improved by the money so raised, and that the location of said roads, the beginning and terminus thereof, and the *maximum* amount, to be expended on each be as follows," etc.

Both the petition and the order calling the election contain the following provisions:

"Each road district shall levy special road taxes to prepare the grade, and lay the base for hard surfacing in its district.

"When such grade and base are completed the County Court shall, with due diligence, proceed to lay the hard surface.

"The County Court is authorized to lay the hard surface with its own plants at force account, or to contract the same: Provided, that if a contract shall be let only for the laying of said hard surface, and the County Court shall purchase and furnish to the contractor all the material necessary in the laying of the hard surface.

"Each road district shall be authorized at its annual meeting held for the purpose of levying a special road tax to elect three freeholders who shall constitute an advisory committee to confer with the County Court in disbursing the road fund belonging to such district."

A demurrer was filed by the defendants challenging the sufficiency of the complaint upon the face of the foregoing recitals.

DEMURRER SUSTAINED AND PROCEEDING DISMISSED.

*Mr. Gilbert L. Hedges,* District Attorney, for the demurrer.

*Mr. O. D. Eby, contra.*

BENSON, J.—There is but one serious question presented by the defendants upon the demurrer, and that is raised by their contention that the election is invalid because it calls for a bond issue largely in excess of 2 per cent of the assessed valuation of the property in the county, and therefore violates Section 19 of Chapter 103 of the Laws of 1913, which is the only statute providing the means whereby a county may hold an election for the issue of bonds for the construction of roads. Plaintiff's reply to this contention is that the limitation expressed in Section 19 of the act referred to has been removed by the latest amendment of Section 10, Article XI, of the Constitution, which became effective some months before the inception of the proceedings now under consideration. This section of the Constitution, as originally adopted, read thus:

"No county shall create any debts or liabilities which shall singly or in the aggregate exceed the sum of five thousand dollars, except to suppress insurrection or repel invasion; but the debts of any county

at the time this Constitution takes effect shall be disregarded in estimating the sum to which such county is limited.''

In 1911, when the crusade for better highways had become vigorous throughout the state, the people, by an initiative measure, amended this section, to read as follows:

''No county shall create any debts or liabilities which shall singly or in the aggregate exceed the sum of five thousand dollars, except to suppress insurrection or repel invasion, or to build permanent roads within the county, but debts for permanent roads shall be incurred only on approval of a majority of those voting on the question.''

Shortly after this amendment became effective, an election was held in Jackson County, wherein a majority of the legal voters determined upon the issue of bonds to the amount of $1,500,000, for the construction of permanent roads, and suit was commenced to enjoin the issue of such bonds in the case of *Andrews* v. *Neil,* 61 Or. 471 (120 Pac. 383, 123 Pac. 32). In that case it was held that the constitutional amendment was not self-executing, so far as it enlarged the debt-creating power of the county, and that there could be no election for the issue of bonds thereunder without prior legislation providing the means or procedure whereby the voters of the county might register their wishes in the matter. Following this decision, the legislature enacted Chapter 103, General Laws of Oregon for 1913, which is the act under which the defendants proceeded in the election which is here involved. Prior to the passage of this act, at the general election in 1912, the people, by initiative action, again amended Section 10, Article XI, of the Constitution to read thus:

"No county shall create any debts or liabilities which shall singly or in the aggregate with previous debts or liabilities exceed the sum of five thousand dollars, except to suppress insurrection or repel invasion or to build and maintain permanent roads within the county; and debts for permanent roads shall be incurred only on approval of a majority of those voting on the question, and shall not either singly or in the aggregate with previous debts and liabilities incurred for that purpose exceed two per cent of the assessed valuation of all the property in the county": See Laws 1913, p. 9.

This 2 per cent limitation was reiterated in Section 19 of the act of 1913, *supra.*

Again, in 1919, under the influence of a vigorous campaign for good roads, this section of the Constitution was amended so that the concluding clause reads as follows:

"And debts for permanent roads shall be incurred only on approval of a majority of those voting on the question, and shall not either singly or in the aggregate, with previous debts and liabilities incurred for that purpose, exceed six per cent of the assessed valuation of all the property in the county": Or. L., Sp. Sess. 1920, p. 5.

1, 2. Keeping in mind the ruling of this court in *Andrews* v. *Neil,* 61 Or. 471 (120 Pac. 383, 123 Pac. 32), that this section of the Constitution is not self-executing as regards its enlargement of the debt-creating power of counties, it seems to be clearly established by the authorities that Section 19 of the act of 1913, limiting such indebtedness to 2 per cent of the assessed valuation of the county, is still in full force and effect. It is fundamental that the powers of the legislative department of a state are absolute, except as limited by the Constitution: 12 C. J. 804. In other words, the Constitution says to the legisla-

tive department, You may provide the machinery whereby counties may issue bonds, incurring an indebtedness for permanent roads, but your machinery is ineffective if it undertakes to authorize such a debt in excess of 6 per cent of the assessed value of the property in the county. This leaves the legislature with full power to limit the county to a still smaller indebtedness, as it has done in the act of 1913.

3. This conclusion is not affected by the fact that the statute was already in existence when the constitutional amendment was adopted. It appears to be the uniform holding of the courts that a constitutional provision which is not self-executing does not affect existing legislation until the enactment of legislation putting it into effect: 12 C. J. 739; 6 R. C. L. 34; *Hall* v. *Dunn,* 52 Or. 475 (97 Pac. 811, 25 L. R. A. (N. S.) 193); *State ex rel.* v. *Portland Ry., L. & P. Co.,* 56 Or 32 (107 Pac. 958).

4. It might be (although it is not necessary to decide) that, if the act of 1913 were differently framed, the election in this case could be regarded as valid up to the limit of 2 per cent of the assessed valuation of the county, but, since the statute requires the order submitting the question to a vote of the people to specify the roads which are to be constructed or repaired, and the minimum amount to be expended upon each of them, it will be readily seen that a bond issue of a much smaller amount would be an entirely different question from that upon which the people have voted. It follows that the demurrer must be sustained, and the proceeding dismissed.

DEMURRER SUSTAINED. PROCEEDINGS DISMISSED.
REHEARING DENIED.

BURNETT, BENNETT and BEAN, JJ., concur.

McBRIDE, C. J. (Dissenting).—The proceedings of the County Court are regular in form, and there is left the one serious question as to the efficacy of the laws, now on the statute books, to authorize the election by which the issuance of the bonds was authorized.

5. It is argued by counsel who presents the case on behalf of the defendant, that the election is invalid because it calls for a bond issue in excess of 2 per cent of the assessed valuation of the property in the county, and is therefore in violation of Section 19 of Chapter 103 of the Laws of 1913, which is the only statute providing the machinery whereby a county may hold an election for the purpose of authorizing an issue of bonds for the construction of roads.

The plaintiff, on the other hand, contends that the amendment to Article XI, Section 10, of the Constitution, which was adopted June 3, 1919, and became effective by proclamation of the Governor on June 23, 1919, operated *proprio vigore* to remove the limitation of 2 per cent prescribed in Section 19, Chapter 103, Laws of 1913, and to authorize counties without further legislative action to issue bonds for the construction of roads, subject to the limitation prescribed in Article XI, Section 10, as then amended; in other words, that the machinery for holding such elections being already in existence, and no new machinery being required for the purpose, the constitutional amendment furnished full authority to counties desiring so to do, to proceed in the manner provided by Chapter 103, Laws of 1913, to hold an election for the purposes above set forth, if the proposed bond issue did not exceed the limitation of 6 per cent prescribed by the last amendment. If the amendment operated as a grant of power directly to the

counties, to incur a bonded indebtedness within and up to the limit of 6 per cent of the assessed valuation of the property subject to taxation, the conclusion is irresistible that the provision is practically, though not technically, self-executing, and that the proceeding here being considered is regular, and a bond issue valid.

If, on the other hand, the amendment is to be construed as merely an authorization to the legislature to permit, by an act afterwards to be passed, counties to issue bonds within a limit of 6 per cent, but less if legislative wisdom should so determine, then the proceeding herein must fail.

This involves a construction of the section in question, which is a matter not devoid of difficulty, but which seems, in the judgment of the writer, to indicate that the amendment now being considered is and was intended as a direct grant of power to the counties to proceed with the legal machinery then in hand, and which, by force of the amendment, was entirely adequate for the purpose, to provide for permanent roads within their limits without interference from other sections of the state, acting by means of their representatives in the legislature and without being limited in their action by other sections of the state.

It may be premised that this is not a case like *Andrews* v. *Neil,* 61 Or. 471 (120 Pac. 383, 123 Pac. 32), wherein it was attempted to hold an election for the issuance of bonds for road purposes in the absence of any statute authorizing such elections, or providing how or where such proceeding should be initiated. In that case we held that the county authorities could not improvise the machinery for calling and holding such an election, and that the attempt to do so was a nullity for that reason. Thereupon, the legislature

passed Chapter 103, Laws of 1913, which enacted a complete Code of Procedure and provided carefully for every step necessary, from the inception of the proceeding to the final issue of the bonds, and which is concededly adequate to the proceeding here initiated, unless the percentage of the issue to be permitted is subject to regulation and restriction by the legislature.

It may also be premised that, while a constitutional amendment is a law of a higher order than one enacted by the legislature, it nevertheless has the same effect upon existing legislation as a law passed by the ordinary methods. Thus it may amend or repeal a prior constitutional or statute provision in conflict with it, just as one statute may amend or repeal a prior one, if such is its necessary effect or intent.

6. In the instant case it would seem that such an intent is plainly evinced, if we examine the history of constitutional and statutory legislation upon the subject in hand. It is a familiar canon of constitutional construction that the courts, in determining the intent of a statute, will consider the circumstances under which it was enacted, and the mischief to be remedied by its enactment, with a view to so construing it, if reasonably possible, to correct the supposed defect sought to be obviated: Cooley, Const. Lim. (7 ed.), 100, 101.

7. With this rule in view, we will first examine the history and evolution of the constitutional provision now under consideration.

Section 7, Article XI, of the original Constitution provided in substance that the *legislative assembly* should not create any debt against the state in excess of $50,000, with certain exceptions therein noted.

Section 10, Article XI, as originally adopted, is as follows:

"No county shall create any debts or liabilities which shall singly or in the aggregate exceed the sum of five thousand dollars, except to suppress insurrection or repel invasion; but the debts of any county at the time this Constitution takes effect shall be disregarded in estimating the sum to which such county is limited."

The Constitution was adopted in 1859, when the state did not contain to exceed fifty thousand inhabitants, had little taxable property, and was poor in everything, except potential natural resources.

A comparison of Section 7 with Section 10 of the Constitution indicates that, while Section 7 is a limitation on the power of the legislature and addressed expressly to it, Section 10 was an inhibition addressed expressly to the counties as such, and in the whole history of legislation upon this subject we find no statute authorizing counties to contract debts within the limit of $5,000. The section was considered as both a limitation and a permission to counties without further legislative action, to contract debts within the prescribed limit, and the only cases which ever arose involving a construction of that section were in those instances where it was claimed the limit had been exceeded.

The distinction attempted to be made above seems to have been in the mind of this court in the various cases, wherein it has been held that an involuntary indebtedness thrust upon a county by operation of law and which it cannot escape, is not within the constitutional inhibition, the substance of judicial reasoning being that, as the county is compelled by law to perform certain duties and to pay for such perform-

ance, it does not "create the indebtedness arising therefrom; but that the obligation being, thrust upon it by superior authority, it did not constitute any part of the $5,000 indebtedness contemplated by the Constitution and impliedly authorized thereby.

Returning now to the evolution of the constitutional amendment, in its present shape, we find that in 1910, owing to changed conditions resulting from new means of locomotion and carriage, inadequacy of rail service and greatly increased population, there arose a general demand for improved and permanent roads, and by an initiative measure Section 10 of the Constitution was amended to read as follows:

"No county shall create any debts or liabilities which shall singly or in the aggregate exceed the sum of five thousand dollars, except to suppress insurrection or repel invasion, or to build permanent roads within the county, but debts for permanent roads shall be incurred only on approval of a majority of those voting on the question": Laws 1911, p. 11.

As before stated, there was no election machinery in existence by which the amended section could be put into execution, and we held that for that reason the counties could not avail themselves of the privilege therein granted until such machinery was provided.

Thereupon Chapter 103, page 170, Laws of 1913, was passed by the legislature, with the following title:

"To authorize the County Courts of the State of Oregon to issue and sell bonds or county warrants of the county for the purpose of building and maintaining permanent highways within the respective counties, and to provide a sinking fund for the purpose of retiring the bonds at maturity; to authorize the several counties of the State of Oregon to hold special elections for the purpose of submitting to the voters

of the county the question of the issuance of bonds and warrants; and generally to provide a complete manner of procedure for the issuance of county bonds for the purpose of the building, construction and maintenance of permanent highways.''

Pursuant to this act, many counties held elections for the purpose of authorizing the issuance of road bonds, and many extensive improvements were authorized and carried to completion.

In 1919 there arose a general demand for further improvements, and it being conceived that the limit of 2 per cent on the assessed valuation of property would not raise sufficient funds with which to effect them, and transportation by means of heavy trucks and automobiles having become more and more necessary, the legislature of 1919 submitted the present amendment, which reads as follows:

''No county shall create any debts or liabilities which shall, singly or in the aggregate, with previous debts or liabilities, exceed the sum of five thousand dollars, except to suppress insurrection or repel invasion or to build or maintain permanent roads within the county; and debts for permanent roads shall be incurred only on approval of those voting on the question, and shall not, either singly or in the aggregate with previous debts and liabilities *incurred for that purpose,* exceed *six* per cent of the assessed valuation of all the property in the county.''

The words in italics indicate the only changes made from the amendment of 1910.

When this amendment was submitted and appeared in the voters' pamphlet there appeared an affirmative argument signed by two members of the Senate and one member of the House, and concurred in by a local good roads committee of Klamath County, setting forth the effect and purposes of the amendment. The

members of the legislature signing this argument were Hon. Geo. T. Baldwin, Senator from the seventeenth district, Hon. W. W. Banks, Senator from the fourteenth district, and Hon. G. H. Merryman, representative from the twenty-first representative district. The purposes of the measure and the reasons why it should be supported, are given as follows:

"1. The measure is intended to grant to counties the option of voting bonds up to 6 per cent of assessed valuation for road purposes—it is a matter left entirely with the particular county. As to whether or not, after the passage of this measure, a county votes bonds, will be no concern of any other county.

"2. Many counties desiring more funds for road work are asking that you consent that they burden themselves if they so desire. Your affirmative vote on this measure does not prejudice you in the least, nor cost you a penny.

"3. If, in the opinion of a county, good roads are a paying investment and badly needed, is it not your duty to vote to allow that county to put the question to its people?

"4. A private corporation cannot do business with only 2 per cent of its capital available, much less can a public corporation make necessary improvements on that amount—6 per cent is little enough.

"5. This is a purely local option measure; no county need assume burdens unless it desires.

"Appeal is made to the sense of fairness of voters to grant the opportunity and privilege for which the measure provides."

There was no negative argument, and the amendment was adopted at the polls by a large majority.

Under our election system, every voter in the state received this voters' pamphlet, and it is safe to say that those who voted for the amendment did so in the light of the explanation furnished by this official

document, and vouched for by eminent members of the legislature, which prepared and submitted it. That the voters thought they were wiping out and removing the 2 per cent restriction and substituting a 6 per cent restriction, and cast their ballots with that intent, must be apparent to any unprejudiced mind.

This brief summary of the history of the legislation on this subject makes it clear to the mind of the writer that it was the intent of the legislature, when the amendment was submitted, and of the people when they adopted it, to do away with the previous 2 per cent restriction and to permit the people of the several counties, within the limit prescribed, to say for themselves without legislative interference, to what extent they would pledge the credit of their counties for the purpose of securing permanent roads.

The original section may have been restrictive, but both the amendments contain permissive elements in that they allow, and, as heretofore shown, were intended to allow, counties to go beyond the original restriction so long as they did not exceed the prescribed 6 per cent.

What was the mischief to be remedied? Clearly the limitation of the power of the counties to tax themselves for permanent roads, by removing the 2 per cent limitation so that up to 6 per cent they would be free to act in the matter as they might choose. The removal of the restriction was an implied grant of the power so to act.

It should be remembered that, in the absence of any restriction, there was in the counties inherent power to contract debts without limitation as to amount. The original section limited the exercise of this power to the creation of a voluntary indebted-

ness of $5,000. The present amendment still further enlarged the privilege, which, without some constitutional limitation, would have been boundless.

Its effect was not only impliedly to amend the previous amendment, but to amend Chapter 103, Laws of 1913, by implication, by inserting the word "six" instead of "two." It is simply a case of amending a law enacted by the legislature by another enacted by the people. There was never any necessity for legislative enactment to prescribe the *limit* within which counties could incur indebtedness. The first amendment did that effectually, but what was then lacking was election machinery by which the counties could exercise the privilege given them by the amendment.

8. Every provision of the Constitution takes effect at once, if there is in existence at the time of its adoption legal machinery by which its mandates can be enforced or its privileges exercised, and there is not an authority in all the reports cited by the defendant to the contrary, and they do not exist.

The question as to whether the amendment is or is not self-executing cuts no figure in this case. A self-executing provision is one which furnishes by its own terms the machinery by which the rights under it may be exercised, but it does not follow that because it does not contain within itself such a formula that the rights granted by it must remain in abeyance, if machinery adequate to carry its provisions into effect already exists, which is the case here. If a farmer purchases a scythe blade, the blade itself is not "self-executing"—it will cut no grass until it has a snath, but, if he already has a snath that will serve the purpose, he would be but a foolish and extravagant husbandman if he purchased a new snath instead of

using the one he already possessed. The simile is homely, but it seems to the writer to be appropriate in the present instance.

This amendment is no mere voluntary proposition suggested by a group of private citizens, but the solemn and deliberate act of the two great law-making bodies of the state acting in conjunction, possessing all the force of a statute and all the supposed sanctity that hedges about a constitutional amendment. Why should the legislature be required to speak again and say in effect, "Section 19 of Chapter 103, Laws of 1913, shall be amended by striking out the figure '2' in line 3, and inserting the figure '6' in lieu thereof, so as to read," etc., when the highest law that can be enacted has by implication done that very thing. To so hold seems to the writer to be clinging to the veriest shadow of an unprofitable technicality at the expense of defeating the intent of the legislature, when it enacted and submitted the amendment and of the people when they ratified it.

9. The history of this legislation seems to the writer to show the legislative construction of the effect of the amendment, which is always entitled to weight and the action of the half dozen or more counties which have acted upon that construction and voted to issue bonds, indicates the construction which the people who voted for it placed upon it, and both indicate a common intent that it should become effective with the machinery ready at hand by which this privilege can be put into immediate effect, and it would be little short of a calamity if the people of Clackamas County and other counties which have taken similar action, should be required to wait until the legislature does what it seems to the writer the amendment itself has already done, and go to the expense or another election to authorize the county

to do what the amendment has already authorized to be done.

For the reasons above given, I dissent from the majority opinion.

HARRIS and JOHNS, JJ., concur in this dissent.

---

Former opinion set aside and writ sustained February 8, 1921.

## ON SECOND REHEARING.

(195 Pac. 358.)

Former judgment and opinion set aside, and dissenting opinion (190 Pac. 1097) adopted as the opinion of the court.

DEMURRER OVERRULED.   WRIT SUSTAINED.

*Mr. O. D. Eby,* for the plaintiff.

*Mr. Gilbert L. Hedges,* District Attorney, for the defendants.

In Banc.

McBRIDE, J.—A full statement of the points involved in this case will be found *ante,* p. 191 (190 Pac. 1097). At that hearing a majority of this court held the opinion that the demurrer to the writ should be sustained and the proceeding dismissed, and it was so ordered. Subsequently and within the term a motion was filed to set aside the order and grant a rehearing, which was done, and the case was submitted for rehearing upon the briefs previously filed.

Subsequent to the order first mentioned we had occasion in the case of *Ladd & Tilton Bank* v. *Frawley,* 98 Or. 241 (193 Pac. 916), to re-examine the ques-

99 Or.—14

tions passed upon in the instant case, and a majority of the court was of the opinion there that the constitutional amendment of 1919 contained a sufficient grant of power to authorize a county to proceed with an election for the authorization of an issue of bonds to raise money to be expended in the construction and maintenance of permanent roads, and that an election for that purpose, so long as the proposed issue was not in excess of 6 per cent of the assessed valuation of the property in the county, was valid without any further legislation. This conclusion necessarily requires a reconsideration of our previous decision in the instant case, and the minority opinion rendered in this case upon the previous hearing is now held to be a correct exposition of the constitutional provisions involved in the present litigation. Our previous judgment is therefore set aside, and an order will be entered overruling the demurrer to the writ and directing the defendant to make delivery of the bonds bid for by plaintiff, upon the payment by him of the amount bid therefor.

WRIT SUSTAINED. FORMER OPINION SET ASIDE.

BURNETT, C. J., and BENSON, J., dissent.